Filed 9/1/17; Certified for Publication 9/20/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOAQUIN C., a Person Coming Under the Juvenile Court Law. | B277434<br><br>(Los Angeles County Super. Ct. No. DK18273) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Respondent,<br><br>      v.<br><br>VERONICA C. et al.,<br><br>      Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Reversed.

Christy C. Peterson, under appointment by the Court of Appeal, for Appellant Veronica C.

Karen B. Stalter, under appointment by the Court of Appeal, for Appellant Joaquin C.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

————————————

Veronica C. and her son Joaquin C. appeal the juvenile court's assertion of jurisdiction over Joaquin C. under Welfare and Institutions Code[1] section 300, subdivision (b) and his removal from her custody.  We conclude that the Department of Children and Family Services failed to meet its burden of proof to demonstrate by a preponderance of the evidence that Veronica C. had failed to adequately supervise or protect Joaquin C.; to provide him with adequate food, clothing, shelter, or medical treatment; or to provide regular care for him.  The juvenile court's finding that Joaquin C. comes within the court's jurisdiction is not supported by substantial evidence.  We vacate the court's jurisdictional finding and reverse the dispositional order.

### FACTUAL AND PROCEDURAL BACKGROUND

Veronica C. has a mental illness described in the record as "Psychosis vs. Schizophrenia, paranoid type."  She gave birth to Joaquin C. in January 2016, and within a week a referral was made to DCFS alleging that she was emotionally abusing her infant son by displaying "paranoid, defensive and delusional thoughts."  DCFS detained Joaquin C. from Veronica C. on July 7, 2016, and on July 29, 2016, the juvenile court declared him a dependent child of the court, under section 300, subdivision (b) (failure to protect).

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

A. Information in the Detention Report

The emergency social worker initially assigned to the case was Adriana Banuelos. Upon investigation, Banuelos found that Veronica C. lived with her mother, Olivia M.; her sister, Patricia C.; and Patricia C.'s four children. The family lived in a clean, organized house with three bedrooms and one bathroom. The utilities worked appropriately, and the family had sufficient food. Veronica C.'s bedroom was "clean and well organized," and suitably furnished.

Joaquin was appropriately dressed and groomed. He had no marks or bruises, and he was in good health. Banuelos wrote that Joaquin C. "appeared well taken care of. [I] observed mother to be very attentive and caring toward Joaquin. Mother breast fed him three times during the home visit, changed his diaper and put him to sleep. Joaquin appeared to be a happy baby and did not cry at all during the visit and slept on and off. Mother and Joaquin appeared bonded."

Veronica C. assured Banuelos she and the baby were safe in her mother's home. She told DCFS she "has plenty of support in the home" and denied any domestic violence, physical abuse, neglect, sexual abuse, or substance abuse.

Veronica C. was "polite, cooperative, and coherent," although it was evident that she did not trust the social worker. Her distrust was at least in part due to a prior interaction with DCFS. In 2015, DCFS enforced an out-of-state custody order and took three of Veronica C.'s children away from her, returning them to their father and her ex-husband Mauricio P. in

Connecticut.[2] Veronica C. said that the previous social worker assured her that she was going to help but then took her children away. Veronica C. feared that Banuelos would take Joaquin C. away from her. She worried that Banuelos had been sent by Mauricio P. and/or was helping him. She hesitated to provide information or to sign consent forms, expressing a fear that information she provided would be used for other purposes. Banuelos reported that Veronica C. "seem[ed] paranoid and did not trust" her. Olivia M. also expressed distrust of DCFS because of its nighttime removal of Veronica C.'s other children.

Veronica C. disclosed that Mauricio C. had physically and verbally abused her. She denied having mental health issues and was offended at the idea that she was "crazy." She also expressed the beliefs that Mauricio P. had tried to poison her and the children, and that he and his family were using black magic against her.

Banuelos "discussed an Up Front Assessment (UFA) and the importance of participating. [She] emphasized that the only way to show that mother does not have mental health issues are [*sic*] to get a mental health assessment. After discussing the

---

[2] Veronica C.'s five older children all lived in Connecticut with Mauricio P., and they had been the subject of a custody dispute. The two oldest children were Mauricio P.'s nephews whom Veronica C. had adopted, and Mauricio P. was the father of the three younger children. In 2015 Veronica C. brought the younger three children to California; Mauricio P. was awarded full custody of them after DCFS returned them to Connecticut. As of July 2016, Mauricio P. was seeking a legal guardianship over the two oldest children. Mauricio P. was not Joaquin C.'s father. Veronica C. was unwilling to provide information about Joaquin C.'s father.

4

process, [Veronica C.] agreed and signed the consent form. Mother emphasized that [Banuelos] should contact her to inform her who would be calling her for the UFA. [Banuelos] agreed to do so."

Olivia M. privately told DCFS that Veronica C. was doing well and was an excellent mother. Olivia M. was not concerned about Veronica C.'s mental health. She disclosed that Veronica C. had been a victim of domestic violence in the past and opined that she might be depressed, but she emphasized that Veronica C. did "a great job" of caring for Joaquin C. and met all his needs. She had observed Veronica C. feeding him, burping him, bathing him, and giving him love. Furthermore, Olivia M. told DCFS that both she and Patricia C. were able to provide support and help to Veronica C. if needed.

Patricia C. did not have reservations about Veronica C.'s mental health, emphasizing that Veronica C. was healthy and took good care of Joaquin C. She believed Veronica C.'s extensive questioning of hospital staff about the care provided to Joaquin C. and to herself after Joaquin C.'s birth had led to concerns about her.

Banuelos spoke with Ruth Villareal, the DCFS social worker who had facilitated returning the three older children to Mauricio P. the previous year. Villareal described Veronica C. as seeing things that were not there and as paranoid; she was bizarre and difficult to work with. She reported that Veronica C. did not "comply" with her requests.

Banuelos also contacted a social worker in Connecticut who was performing a court-ordered assessment in conjunction with Mauricio P.'s petition for legal guardianship of Veronica C.'s two oldest children. The Connecticut social worker had spoken to

5

Veronica C. only twice; she said that Veronica C. had been emotional and pleaded for the release of her children to her, but Veronica C. had not followed up with the social worker on court recommendations.

Banuelos again visited the family home on February 10, 2016. Joaquin C. was observed to be appropriately dressed and groomed, with no bruises; he appeared healthy and well-cared-for. Banuelos explained to Veronica C. that the UFA report said that she showed symptoms of depression and that mental health services were recommended. According to DCFS, Veronica C. "agreed and cried while she spoke of past [domestic violence] and the trauma of losing her children. Mother said she knows she needs counseling to help her feel better. [Banuelos] then discussed a [voluntary family maintenance (VFM)] case and services that would be provided to her. Mother agreed to a VFM case without hesitation. [Banuelos] explained the need to have a Child Family Team (CFT) meeting and what a CFT meeting entailed. [The social worker] encouraged mother to bring family, friends, or anyone who could provide support. Mother stated she would be available anytime next week for a CFT meeting. [Banuelos] agreed to contact mother once the meeting was scheduled. Mother thanked [Banuelos] for the help."

At the subsequent CFT meeting on February 24, 2016, which was attended by Veronica C., Olivia M., Patricia C., and Joaquin C., "[i]t was apparent" that Veronica C.'s mother and sister provided "support and encouragement" to Veronica C. DCFS observed that she had a good relationship with her sister and her mother. Veronica C. discussed her goals, challenges, and strengths. She became emotional when discussing the legal issues regarding her other children but was able to calm herself.

After the CFT meeting Banuelos and Veronica C. contacted a mental health services provider, and Veronica C. completed a telephonic assessment. Veronica C.'s first mental health services appointment was set for March 9, 2016. Veronica C. attended that session as scheduled, and her next appointment was scheduled for two weeks later with her new therapist, Daisy Munoz.

New personnel and service providers began contacting Veronica C., and she became confused and concerned. On March 9, 2016, Banuelos was replaced as the social worker by Martha Carrasco. When Carrasco telephoned Veronica C. to set up an appointment, Veronica C. thought they already had an appointment set for the following day. Carrasco told her that she might be confusing her with a family preservation social worker. Veronica C. reacted defensively, saying that she was not crazy, and said she did not have time for Carrasco. When Carrasco explained that she had met with Banuelos, Veronica C. "relaxed," although she became concerned again when the telephone number that Carrasco gave her did not match the caller's telephone number displayed on her telephone. Carrasco explained that this was due to the landline telephone she was using. Veronica C. agreed that Carrasco could visit the home two days later as requested if Carrasco provided identification and her business card. At about this time, a family preservation services worker contacted Veronica C. to set up services, and Veronica C. declined, saying that she did not have time for those services.

Carrasco and Veronica C. met for the first time on March 18, 2016. Veronica C. showed Carrasco her room and permitted her to examine Joaquin C. Carrasco found the baby to be "well

dressed for the weather" and free of any bruises or marks other than a birthmark. Veronica C.'s room was clean and neat. In response to Carrasco's questions, Veronica C. reported that she had attended her first session with her therapist and showed Carrasco paperwork that reflected that her next appointment was set for March 21. When Carrasco spoke of food stamps and cash aid, Veronica C. showed Carrasco documentation showing that she had applied for government assistance.

Veronica C. agreed that Carrasco could visit the home twice per month and perform unannounced visits, but said she did not want other services. Carrasco pressed Veronica C. to accept services in what she characterized as "an intensive conversation." Carrasco appears to have suggested that complying with DCFS's requested services and programs was a route to reunification with her older children who were in their father's custody: she reported telling Veronica C. that she "might have to sacrifice and complete her programs and/or services before she can reunite with her other children." Veronica C. was upset and said she did not need help, but she calmed down when Olivia M. advised her to listen to Carrasco because she was trying to help. As Carrasco encouraged Veronica C. to participate in family preservation services such as money management and "teaching and demonstrating," Veronica C. wanted to know "who and how many people would be coming to her home." Carrasco said that she did not know because it would depend on Veronica C.'s needs, which would be discussed at a later meeting.

Veronica C. continued to attend her scheduled sessions with Munoz in March and April. At Carrasco's request, she signed a consent form authorizing Munoz to release information to Carrasco.

In April, Veronica C. became upset when a family preservation services provider wanted her to sign documents but could not provide her with copies of them. When Veronica C. slammed her hand down on the table, the service provider told her she was being disrespectful and reported to DCFS that she was "concerned" about Veronica C.'s mental state.

Veronica C.'s therapist Munoz spoke with Carrasco on April 5, 2016. Veronica C., Munoz observed, was "very attentive to Joaquin's needs." She was suffering from the loss of custody of her older children. Munoz was "concerned about mother's mental state."

Carrasco informed Munoz that she (Carrasco) had recommended that Veronica C. see a psychiatrist, but Veronica C. declined. She also informed Munoz that Veronica C. "has mood swings and her mental state is not stable." Munoz responded that she was developing rapport with Veronica C. and said she would recommend seeing a psychiatrist to Veronica C. at their next appointment.

On April 7, 2016, a mental health worker went to Veronica C.'s home and offered mental health services to Joaquin C., who was not yet five months old. Veronica C. laughed and declined mental health services for her pre-verbal infant, leading to a conversation between the worker and Carrasco about "mother's mental status."

Veronica C. cancelled a meeting with the family preservation services provider on April 12.

On April 15, 2016, Carrasco arrived at the family home for an unannounced visit. She heard Olivia M. tell Veronica C. that she was there, and Veronica C. responded, "I don't want any CSW [Clinical Social Worker]." Olivia M. encouraged Veronica C. to

talk to Carrasco, and Veronica C. brought Joaquin C. out to the living room to see her. The baby was well groomed and dressed appropriately, with no marks or bruises. He made eye contact with Carrasco when she spoke to him. Carrasco observed Veronica C. carrying Joaquin C., and they appeared bonded. Veronica C. was relaxed and said they were fine. She reported that Joaquin C. slept well. Veronica C. confirmed that she was receiving cash aid and food stamps; she also had received coupons for formula although she was breastfeeding Joaquin C. Veronica C. said that she had not picked up formula yet, but that she would do so because she was planning to transition Joaquin C. to formula in case she became employed in the future.

Carrasco brought up therapy, telling Veronica C. that "little by little" it would help her. "Not little by little," said Veronica C., laughing. "I do want therapy," she told Carrasco. "I will attend therapy."

Carrasco told Veronica C. to expect a visit from a different family preservation services provider as her assigned worker was on vacation. Subsequently, there was some misunderstanding between DCFS and the provider, and Veronica C.'s family preservation case was closed.

Veronica C. missed her April 21 session with her therapist.

In an unannounced April 28 visit, Carrasco found Veronica C. and Joaquin C. outside on the patio preparing to go for a walk. Joaquin C. was in his stroller and was well groomed; he smiled when Carrasco said hello. Veronica C. invited Carrasco inside. Veronica C. reported she was feeling fine. Carrasco asked Veronica C. if she was continuing to go to therapy, and Veronica C. informed Carrasco that she had forgotten her most recent counseling session and had rescheduled

10

it for May 4.[3]  Carrasco "explained to mother [] the importance of keeping the appointments."  Carrasco offered Veronica C. an appointment book, but she said she would not forget her appointment.  She told Carrasco that said she had been wearing her mother's gold earrings, which confused her; she took them off and was fine.

Carrasco asked how Joaquin C.'s transition to formula was proceeding, and Veronica C. reported that he did not like the formula.  Carrasco suggested consulting Joaquin C.'s pediatrician about trying a different formula, and Veronica C. told her that their next appointment with the pediatrician was scheduled for May 17, 2016.

On May 5, Munoz reported to DCFS that Veronica C. had appeared for her May 4 appointment at the wrong time.  Munoz reported that Veronica C. became confrontational when informed that she had missed her appointment; Munoz apologized if there had been a misunderstanding.  They scheduled another session for May 19.  Munoz did not consider Veronica C. to have been a "no-show" for the appointment; she had appeared, and deserved credit for that, but was mistaken about the appointment time.  Munoz said she would have seen Veronica C. when she showed up had she not been busy with a crisis.  Carrasco told Munoz about the "earring incident."  Munoz said that Veronica C. had delusional thoughts.

On May 14, 2016, Carrasco made another unannounced home visit.  Olivia M. showed her in, and presently Veronica C. came in with a well-groomed Joaquin C.  Veronica C. said Joaquin C. was fine but she was concerned about his navel, which

---

[3]    Munoz later confirmed that Veronica C. had rescheduled the appointment.

she described as "popping out." Carrasco looked at Joaquin C.'s navel but did not think anything was amiss. During the visit, Veronica C. signed a receipt with the date May 15. Olivia M. corrected her about the date, but Veronica C. did not believe her and said she was lying. When Carrasco showed her the date on her cellular phone, Veronica C. corrected the date on the receipt. Veronica C. said she had been wearing her mother's gold earrings and did not feel well, so she took them off. Veronica C. agreed to re-start family preservation services.

Carrasco made another unannounced visit on May 25. Joaquin C. was well-groomed, and Veronica C. confirmed that he had received his immunizations. Veronica C. said that she had forgotten to discuss the possibility of another formula with the doctor, and she continued to breastfeed the baby. Veronica C. responded affirmatively when Carrasco asked if she was going to therapy. Family protective services had not contacted her at that time.

When she was subsequently contacted, Veronica C. refused family preservation services. Then, on June 7, 2016, Carrasco and the family preservation services worker, Adriana Torres, visited Veronica C. Olivia M. directed the women to Veronica C.'s room, where Veronica C. allowed them in. Joaquin C. was well-groomed and was lying on the bed. Carrasco and Torres spoke with Veronica C. about the benefits of family preservation services. Veronica C. said that the last time Torres had come to the home, her use of her cellular phone had disrupted the family's television reception and that the signal had not returned. As Veronica C. began to sign a consent to receive family preservation services, she said that she did not want the services to last more than six months. When Carrasco said that she could not

guarantee a six-month timeframe, Veronica C. said that in that case she did not want services. After Carrasco emphasized how important it was to address the issues that raised DCFS's concerns, Veronica C. relented, signed the consent form, and agreed to services. She made reference to needing to remove her earrings because with them on she could not focus, and Carrasco advised her to discuss that with her therapist. Veronica C. agreed to meet with Torres and to participate in a case planning committee meeting later in June.

On June 10, Munoz told Carrasco that psychotropic medication could not be prescribed to Veronica C. because she was breastfeeding. She said that because Veronica C.'s mental health issues were longstanding, Veronica C.'s psychiatrist[4] had recommended increasing her therapy to a weekly basis (rather than a twice-monthly basis) while she was breastfeeding and could not be medicated. Munoz told Carrasco that Veronica C. needed to wean Joaquin C. so that she could take medication.

At the June 21 case planning meeting, Carrasco began to explain to Veronica C. DCFS's concern about her mental state. Veronica C. responded, "I don't have mental problems" and said that she did not want services. During the meeting Veronica C. described smelling a foul odor coming from her phone while she was speaking with Mauricio P. about their children. The team called off the meeting at that point to bring in a supervising social worker.

Carrasco reported that the following day she had a conference call with supervisors at DCFS and the family preservation services agency. Carrasco described the call as

---

[4] We cannot determine from the record when Veronica C. began seeing the psychiatrist.

13

follows:  "Ms. Marquez [the family preservation services worker], [DCFS supervising social worker] Curiel and CSW Carrasco attended a case conference call and stated due to mother mental instability [*sic*] there [*sic*] not able to work with her because need [*sic*] psychiatrist medication to stabilized [*sic*] and be able to provided [*sic*] services."

On June 23 Munoz advised DCFS that she was unable to provide services to Veronica C. because weekly sessions were insufficient to address her chronic condition, and she said that "without psychotropic medication mother will not be stable."

Carrasco spoke with Mauricio P., who advised her that five years earlier, in 2011, Veronica C. had "displayed delusion statement [*sic*] that he wanted to kill her."  She was hospitalized for 24 hours and then "released to him stating mother was fine and does not need mental health services."  Mauricio P. believed that Veronica C.'s family was "in denial" about her mental status and said he had "reached out to them" to inform them of how she was behaving.

On July 1, 2016, DCFS submitted a warrant for the removal of Joaquin C., and on July 5, the court granted the warrant.

On July 7 a DCFS social worker, who does not appear from the reports to have previously met Veronica C. or worked on her case, went to the family's home to detain Joaquin C.  Olivia M. called the police to report that someone was trying to take Joaquin C., and the social worker also called the police for assistance.  Initially, Veronica C. refused to come out of her bedroom with Joaquin C., although she did show Joaquin C. to the officers from inside to demonstrate that he was safe.  The police told Veronica C. that she needed to come out, and she

14

complied, holding Joaquin C. She refused to hand Joaquin C. over to the officers. The police then told her that Joaquin C. needed a diaper change, and when she placed him on the bed to change him, one officer held her down while another "grabbed" Joaquin C. Veronica C. was described by the police as "very emotional and upset" during the encounter.

That day, Veronica C. left a message for Munoz; she was in tears because Joaquin C. had been removed. Carrasco wrote that "Munoz said mother need be [*sic*] on psychiatric medication because her dilution [*sic*] thoughts are increasing." Carrasco reported that she asked Munoz to "explain again to mother the impotence [*sic*] of taking psychiatric medication."

Carrasco spoke with both Veronica C. and Olivia M. the day that Joaquin C. was removed. Olivia M. wanted to know why DCFS took Joaquin C. away. When Carrasco "attempted to explain about mother's mental health condition," Olivia M. "started yelling" and said that her daughter was not "crazy." Veronica C. wanted her son back and told Carrasco that she needed to nurse him. Carrasco told her she could rent a breast pump.

Veronica C. was offended by Carrasco's reference to a foster "mother," telling Carrasco that she was Joaquin C.'s only mother. She raised her voice and argued with Carrasco when Carrasco directed her to the Children's Court because she had expected that proceedings would be at a local courthouse. Carrasco reported hearing Veronica C. say to her mother, "They're laughing at me." Carrasco said that Olivia M. said, "[W]e're not laugh [*sic*] at you, you're crazy." Olivia M. told Veronica C. that Carrasco was trying to give her the court address and she should write it down.

Carrasco wrote in the detention report on July 12, 2016: "Mother has a history of emotional and mental health issues, and she has lost custody of her five older children to their father in Connecticut. [¶] Mother continues to suffer from mental and emotional issues, including paranoia, delusional behavior, and aggression. She is resistant to any type of treatment, including medication and counseling. Family Preservation is unable to work with her because she will not make herself available for appointments. [¶] Despite offering mother a VFM case for the past 6 months, mother has not been able and/or is unwilling to adequately address her mental and emotional issues. [¶] Mother's conduct endangers the physical and emotional well being of the child such that the child is at risk of suffering emotional or physical harm."

B. The Dependency Petition and Detention

DCFS filed a juvenile dependency petition alleging that Joaquin C. came within the jurisdiction of the juvenile court under section 300, subdivision (b) (failure to protect). The juvenile court held the detention hearing on July 12, 2016. Joaquin C.'s counsel argued that DCFS had not made a prima facie case that Joaquin C. was at risk in his mother's care. She argued, "I understand they have concerns about her mental health. She was taking care of the child. She was breastfeeding. He appeared healthy. They never indicated any concern for his well-being while in her care other than her mental health concerns. There's no evidence that she's had a psychiatric hospitalization or any other outbursts other than the detention from the child to indicate she was putting the child at risk with her mental health."

16

The court described Veronica C. as uncooperative with "everything that they asked her in the investigation. And there doesn't seem to be any good reason why—the way she reacts to these simple questions. And if she just answered, they probably would have said, 'Okay. We can help by giving you this or that service.' [¶] But her conduct and demeanor gives any reasonable person pause to say, 'Why would somebody behave in this fashion if there wasn't a great deal of mental disability that would put a child at risk?"

Joaquin C.'s attorney acknowledged the court's concern but argued that Veronica C.'s failure to cooperate "hasn't translated to the neglect of this child at this point."

The court said, "I mean, if she were cooperative, we had a CFT and she would actually get along and answer questions, I might feel different, but I'm not feeling very sympathetic to her, the way she's behaving. I understand she's upset. She can have all of the tissues from my tissue box if she wants, but I want answers."

Veronica C.'s attorney responded that she understood the court's concerns. "However," she continued, "I join with [Joaquin C.'s counsel] in terms of the fact that we do need to look at how this child was being cared for[,] including the fact that there was quite a lot of maternal support even as evidenced by what is going on in court today [Patricia C. provided information to the court during the hearing]. What we are seeing is, perhaps, mother responds in an eccentric manner. She may respond in a way that other people would not respond. And then we have the support of the maternal relatives. She lived with the maternal grandmother. She lived with the maternal aunt who is speaking in the back of the courtroom who is being very reasonable and

17

answering the court's questions.  This is a family that supports the mother, a mother who while she may, again, not respond in ways how we would like her to respond, is caring for this child."

The juvenile court expressed concern that it could not verify the child's condition.  In response, counsel for Veronica C. emphasized the verification that DCFS had done.  "They have come to her home and looked at Joaquin a number of times.  This was not a person who was refusing entry into her home or saying that the child was unavailable.  We've seen that.  We've seen that before, people who don't let their child be checked out.  And this was a woman who every time the Department comes to her home, she spoke to them.  She doesn't always provide the answers they want.  She didn't appear to be very cooperative with family preservation, but the Department was able to verify on numerous occasions the child was well dressed.  The child was well bonded.  The mother is—the therapist said the mother is very attentive to the baby's needs.  The Department consistently states that, again, 'Joaquin is well groomed.  No marks or bruises.  It appeared the mother was bonded with her child.'  That's the verification, the unannounced home visits.  Go into Mother's home to see that Mother is caring for her child.  [¶]  'There are no marks or bruises.  The child is well bonded.'  [¶]  Again, on another page, 'Joaquin is well groomed.  Joaquin smiled at the social worker.'  [¶]  Again, on page 12, 'The child Joaquin is [] well groomed.'  [¶]  Again on page 13, 'Joaquin is well groomed.  Mother got the child immunized.'  [¶]  These are [] the times they are going to the unannounced visits and seeing the child.  So my client is providing that verification."

Veronica C.'s counsel also told the court that Veronica C. was willing to continue weaning Joaquin C. from breastfeeding so

18

that she could take psychotropic medication. She requested that the child be released because there was "no prima facie basis that the child is not cared for with the mother."

The court rejected any verification other than by Veronica C.'s cooperation: "[W]e need to know that the parent is caring for the child. [¶] And if the mother has mental health issues and needs medication, then she does need to wean the child off of breast milk and on to formula so she can take whatever medication is prescribed. [¶] I'm allowing breastfeeding so long as the mother is testing clean of all drugs."

Counsel for DCFS informed the court that DCFS was not asking for Veronica C. to be drug tested, and advised consultation with her therapist and psychiatrist. The court both insisted she be tested to continue breastfeeding and told her to wean Joaquin C. "as rapidly as possible considering the child's age."

The juvenile court detained Joaquin C. in foster care and ordered monitored visitation with family members to be evaluated for monitors. DCFS clarified that it was asking only for the visits to be monitored at the DCFS office. "Fine," said the court. "Your Honor, I just don't understand—" began Veronica C.'s attorney. "No. No. No. Stop it, would you? We are going to a no time waiver trial in three weeks, Ms. Berger, okay?"

C. Information in the Jurisdiction/Disposition Report

Dependency Investigator Monica Vielmas prepared a report for the juvenile court in advance of the adjudication hearing set for July 29, 2016.

1. Referral Details

    a. 2015 Referral

Vielmas presented further information about DCFS's involvement in returning three of Veronica C.'s children to Mauricio P. in Connecticut in 2015. A referral had been made to DCFS in June 2015 by a caller who alleged that Veronica C. had taken the three children to California while a child protection investigation was ongoing. The caller said that Veronica C. and Mauricio P. had an argument, and she took the children to sleep in the car. She returned to the home and accused Mauricio P. of trying to poison her and the children. In the past she had accused Mauricio P. of trying to kill her. The caller advised that Veronica C. was paranoid, internalized what she saw on television, and told the children that Mauricio P. had the power to control the world and manipulate events with a television remote control. The caller also stated that Mauricio P. had encouraged Veronica C. to seek treatment and accept services from the child protective services agency in Connecticut, but she refused, and Mauricio P. petitioned for full custody of the children.

As part of the investigation of the referral, DCFS had spoken in July 2015 with a social worker in Connecticut who had investigated the family in response to a referral made there by Mauricio P. That social worker, who spoke with Veronica C. the day before she left for California, found her to be "out there," erratic, and suspicious of his identity even after he showed her identification and his government car. Veronica C. thought Mauricio P. was "out to get her" and the children and ascribed to him the power to control the world with a remote control. The

children confirmed that Veronica C. had paranoid thoughts. The social worker found Mauricio P. to be appropriate but was concerned about the children's safety in the care of Veronica C., whose mental state he described as fragile.

The 2015 DCFS referral was closed as inconclusive.

b. 2016 Referrals

Vielmas also provided further information about the January 2016 referral involving Joaquin C. The referral alleged that Veronica C.'s statements to hospital staff after Joaquin C.'s birth raised concerns about her mental health. Although the basis for the caller's knowledge was not explained, the caller reported that Veronica C. had "extensive psychiatric history." The caller described Veronica C. as becoming paranoid, defensive, and illogical in language while she was in the hospital. The caller described Veronica C.'s language and behavior as beginning to "present a lot of red flags." This referral led to the DCFS intervention and VFM case described above.

The detention report also indicated that a second referral had been generated about Joaquin C. This February 2016 referral alleged that during an interview with the Department of Public Social Services, Veronica C. became "verbally aggressive" and paranoid. Veronica C. had been asked to provide fingerprints, and she was afraid that the worker was plotting to take away Joaquin C. There was no disposition of that referral.

21

## 2. Observations of Joaquin C. and Visitation

Vielmas observed Joaquin C. and Veronica C. while she monitored a visit on July 13, 2016. Joaquin C., she reported, "appeared to be a happy baby." He smiled immediately when Vielmas said hello to him, and he smiled every time she said his name. Veronica C. told her that Joaquin C. was a happy baby.

Joaquin C. was growing age appropriately, and at the age of six months he could sit with support, grasp and mouth objects, vocalize sounds, and reach for and hold his bottle. DCFS concluded that he exhibited no "emotional problems that would warrant counseling."

Veronica C. had arrived late for the visit. When she saw Joaquin C., she looked like she was on the verge of tears; she embraced Joaquin C. and kissed him. She told Joaquin C. that she missed him and worried aloud that he was "too skinny." During the visit Veronica C. fed Joaquin C., gazed into his eyes, and talked to him. Joaquin C. looked comfortable in her arms and drank his entire bottle.

No problems were reported with the visit, and the visit appeared to DCFS to have gone well. Veronica C. sought and received permission to trim Joaquin C.'s nails during the visit, and she proceeded to trim his nails with her teeth. She was subsequently advised not to trim his nails that way.

## 3. July 14, 2016 CFT Meeting

Veronica C., Patricia C., and a number of DCFS employees attended a CFT meeting on July 14, 2016. Veronica C. said her goal was to regain her family, including her children in Connecticut. She agreed to discontinue breastfeeding, to

take her prescribed medication, and to attend all of her mental health appointments. She agreed to participate in individual counseling to address the trauma of prior domestic violence. Patricia C. said that she would continue to provide support to Veronica C.

DCFS agreed to consider placing Joaquin C. in the custody of another maternal aunt, Blanca C., who had volunteered to care for him.

### 4. Interview of Veronica C.

Vielmas interviewed Veronica C. at home on July 15, 2016. She observed that Veronica C.'s bedroom was neatly kept, and complimented Veronica C. on her tidy room. Veronica C. responded, "As you could see everything is in order and that's why I don't understand why my son was taken away."

Veronica C. asked Vielmas who she was and the purpose of her visit. Vielmas had met mother on July 13, the day after the detention hearing, and she explained that she worked for DCFS. Veronica C. questioned Vielmas, identifying another worker as being employed by DCFS. Vielmas explained that she and a number of others were all from DCFS, but Veronica C. remained suspicious and told Vielmas that she did not know who Vielmas was or whether she was misrepresenting herself and planned to do something "against" her.

Veronica C. said that she did not know why Joaquin C. was taken from her because she had been taking good care of him. She had noticed that he was "skinny" and had a scratch on his face since being taken into foster care. Vielmas reported that Veronica C. said, "The state wants me to be on medication so that they could keep my son, but I already stopped the state and on the 29th [July 29, the date set for the adjudication hearing] I

should be getting my son back.  I am not crazy."  Vielmas asked what stopping the state meant; Veronica C., believing that her acceptance of aid caused Joaquin C. to be detained, said that she had stopped accepting all government assistance.  She began to cry and said she wanted her son and all her children with her.

Veronica C. told Vielmas that she was not crazy, but that she would take her medication to get her son back.  Vielmas told her that Joaquin C. had been detained because Veronica C. "had been diagnosed with a mental health condition and that she had failed to follow through with her treatment and take medication for her condition."  Veronica C. responded, "Daisy [Munoz] stopped my sessions because she told me that I needed to see a psychiatrist.  I told her that I was not crazy but that I would see the psychiatrist anyway.  When I saw the psychiatrist, the psychiatrist said that I could not be placed on medication because I was breast[]feeding my son.  Daisy then said that she was going to close my case because I could not take medication at that time."

Vielmas asked Veronica C. if she was aware of her diagnosis of psychosis vs. schizophrenia, paranoid type.  Veronica C. said she did not have that and that she was not crazy, but that "[t]hey just want me to take medication so that the state can continue to help me."  She denied being hospitalized or suffering from delusions.  Vielmas characterized Veronica C. as "defensive."  Veronica C. told Vielmas that she was stressed because she did not have her children.  She cried again, saying she did not understand why her children had been taken away.

Veronica C. told Vielmas that she had gone to see her therapist on July 8, 2016, and began taking psychotropic medication on July 9, 2016.  She described her daily medication

24

regimen and explained how the medication had been adjusted after the initial prescription. She again said that she was not crazy but that she would take medication to get her son back. Veronica C. said she felt calm on the medication. She denied hearing voices or being suicidal. She said that when she felt sad and started to cry, she wrote down her thoughts and tried to think of something else. She told Vielmas that her goal was to regain custody of Joaquin C. and she also hoped to regain custody of her other children.

Vielmas asked Veronica C. if she ever had conflict with her family members. Veronica C. said that she got upset when the house became dirty after she cleaned it, and expressed that she did not like that her family had a cat. She explained that because of this conflict it was good that she had her own space at the home that was separate from that of the rest of the family.

Vielmas described the interview with Veronica C. as very difficult because Veronica C. discussed unrelated subjects. She reported that Veronica C. said that women did not tend to talk with her, and that she was not jealous when other women had "a better body" than she did. Veronica C. asked if it was possible to change Joaquin C.'s name on his birth certificate, but when Vielmas wanted to know why, she said that it was just good to know and that Vielmas did not need to know her reason for inquiring. Veronica C. did not want to discuss her other children, as they were not a part of her present case. When Vielmas pressed her, stating that she needed information about the other children as part of her investigation, Veronica C. told her that the children's father had custody of them. Vielmas wanted Veronica C. to show her custody documentation, but Veronica C.

refused, stating that she did not know who Vielmas was and that she could be misrepresenting herself and her purpose.

5. Interview of Munoz

Vielmas spoke with Veronica C.'s therapist, Munoz. Munoz described Veronica C. as having suffered a lot of trauma caused by Mauricio P.: Veronica C. had disclosed that there had been domestic violence, and Munoz believed she had suffered both physical and mental abuse.

Vielmas asked Munoz what the risks to Joaquin C. would be if Veronica C. did not take her psychotropic medication, and Munoz said that she did not know what the risks were because, to her knowledge, Veronica C. had appropriately cared for Joaquin C.

Munoz told Vielmas that Veronica C. did not yet have the insight to understand her mental health problem, and that at present her delusions were so deeply grounded that she could not recognize her problems or understand reality; it would take some time for her to understand her condition. With time and medication Veronica C. would be able to recognize when she was being delusional. She observed that Veronica C. was guarded, standoffish, and defensive, and that she had the paranoid belief that the social services agencies were out to get her.

Munoz also reported that she had been working to educate Veronica C.'s sister, Patricia C., on Veronica C.'s condition, and that Patricia C. appeared to understand the diagnosis. Patricia C. was very involved with Veronica C.'s treatment and asked questions during Veronica C.'s sessions. Munoz believed that Veronica C. needed to be educated about her condition, and that she also needed her family's support. Munoz recommended

that the family meet with a support group so that they could gain knowledge about Veronica C.'s mental health issues.

     5.  Interview of Patricia C.

Patricia C. spoke with Vielmas on July 19, 2016. Patricia C. said that she was aware that Veronica C. lost custody of Joaquin C. "due to her mental health condition. She is not crazy, but she is suffering from a condition. I am aware that she needs to take medication so that she can get better and get her son back."

Patricia C. reported that Veronica C. was taking her medication twice daily as prescribed. Veronica C. had improved since she started taking the medication: she was no longer constantly crying and appeared calm. Patricia C. believed that Veronica C. understood her condition most of the time but that she was afraid to accept it.

Patricia C. told Vielmas that she had never seen Veronica C. become irritable with Joaquin C. or lose her patience with him. She said, "Veronica always took good care of Joaquin. [She] loves her son and she was 100% providing care for him." She characterized Veronica C. as providing more care to Joaquin than many other mothers did for their children. Veronica C. was "always attentive" to Joaquin C.

Patricia C. had first noticed a problem with Veronica C. after she gave birth to her daughter in 2013. Patricia C. believed Mauricio P. had contributed to Veronica C.'s condition: "For years Mauricio would tell her that someone was doing witch[]craft on her and I think that because for years she heard this from Mauricio, she began to believe it. Mauricio played with her emotions and made her believe things that weren't true. He

27

was physically abusive with her.  I heard that on one occasion, Mauricio hit Veronica's head against the tub.  The therapist had asked me, if Veronica had suffered from head trauma because it was possible that head trauma could have caused Veronica to develop this condition.  Veronica was married to Mauricio for many years and he manipulated her and used to do whatever he pleased.  Veronica stayed because she didn't know any better and thought that the life she had with Mauricio was normal.  Mauricio used to call my mom and tell her to go pick Veronica up from his home or else he was going to prostitute her."

Patricia C. knew that Olivia M. had sought help for Veronica C. after Veronica C.'s daughter was born.  She believed Veronica C. had postpartum depression, but she was not entirely sure.  Veronica C. had been under a doctor's care and was prescribed medication.  Mauricio P., however, told her that her family was trying to poison her and convinced her to stop taking the medication.  She discontinued treatment.  Patricia C. did not know the dates of Veronica C.'s treatment or the specific diagnosis, but agreed to try to obtain that information for DCFS.

Patricia C. confirmed that she understood that Veronica C. needed help and she needed to take her medication to get better and to be able to regain custody of Joaquin C.

6.  Interview of Mauricio P.

On July 18, 2016, Mauricio P. told Vielmas there had been no domestic violence and he never hit Veronica C.  Veronica C. had once reported to the police that he had hit her, and the police made him leave their home.  He said that Veronica C. used to say a lot of untrue things.

Mauricio P. said that he first noticed a problem with Veronica C. in 2011 after one of their sons was born. Veronica C. became depressed and did not want to get out of bed; she would not feed the children. She once said she wanted to kill herself. Veronica C. had believed that his brother had tapped her phone, that the neighbor wanted to kill her, and that the Puerto Ricans and Americans all wanted to kill her. According to DCFS, Mauricio said, "During one of her delusions, she admitted to me that she used to cheat on me when I used to go to work."

Mauricio said he took Veronica C. to the hospital. After 24 hours of observation, the doctor said there was nothing wrong with her, and she was released. He said that he contacted children's protective services about Veronica C., but then she left for California with three of the children.

### 7. DCFS Conclusions

DCFS identified as strengths of Joaquin C.'s family that "Mother has begun counseling and begun taking her medication"; "Mother appears to have a strong bond with her child and has expressed a desire to regain custody of him"; "Mother has been observed to be attentive and caring towards the child"; "Mother has a strong family support system"; "Mother has stable housing"; "Mother is responsible"; and "The child appears to be a happy baby."

Nevertheless, DCFS concluded that "The evidence indicates that mother, Veronica C[.] is suffering from psychosis and is unable to recognize her problem due to [her] current state of mind, which places the child at risk of abuse or neglect." "Although[] mother has not done anything directly to harm the child, her condition places him at risk."

D. Adjudication Hearing

At the July 29, 2016, adjudication hearing, DCFS presented no evidence beyond the reports that had been generated in the case. The court accepted Veronica C.'s trial brief as an exhibit.

The court indicated its intent to find true the allegation of the petition. Veronica C.'s attorney asked the court to dismiss the petition. She argued that Joaquin C. was being well taken care of by his mother; there was no indication that any of his needs had not been met; and it had been confirmed by Veronica C. and her family that she was taking her medication. Counsel noted that Munoz had reported that she did not know what risks there would be to Joaquin C. if Veronica C. did not take her medication, because to Munoz's knowledge Veronica C. had cared appropriately for her son.

Veronica C.'s counsel observed that DCFS's sole recorded complaint about Veronica C.'s parenting concerned trimming Joaquin C.'s nails with her teeth during a visit. She argued that this was a cultural practice, a practice sometimes recommended to mothers so that they would not cut their babies accidentally with scissors, and nowhere near enough to indicate that Veronica C. was unable to care for her child. She argued that the mere diagnosis of a mental health issue was not sufficient to permit the court to detain a child.

As far as Veronica C.'s hospitalization, her counsel argued that Mauricio P. had indicated that she was released after observation because the doctor said there was nothing wrong with her; that this event had occurred five years earlier, long before Joaquin C.'s birth; and that there was no evidence that Veronica C. had recently been hospitalized or was unable to care for Joaquin.

Veronica C.'s attorney concluded, "All of his needs were being met.  My client has family support.  That is well documented.  She's taking her medication.  She is complying.  This child needs to be home with his mother."

Counsel for Joaquin C. joined Veronica C.'s arguments and requested dismissal of the petition.

DCFS argued in response that Veronica C. was mentally ill and that she was paranoid and delusional; that this had been observed "historically" in Connecticut and confirmed by Veronica C.'s suspicion of Vielmas.  Counsel represented that they were in court because family preservation services failed due to Veronica C.'s failure to participate, and because Munoz felt that Veronica C. needed a psychiatrist because her mental health was "going down."  He argued that Veronica C.'s condition was longstanding and untreated.

DCFS acknowledged that Veronica C. had begun taking medication, but because this was a recent development DCFS "feels because of the extended history when mother has not been compliant with services and medication and because of the very vulnerable and young age of this child" he should be declared a dependent child and removed from his mother.

The juvenile court found true the allegation in the dependency petition.  It described the situation as "a failed VFM with a mental health condition that was treated for many years.  Mother agreed voluntarily to go into treatment and then refuses to do the treatment.  The workers are really between a rock and a hard place.  The mother agreed that she needed treatment in order to take care of her child adequately and then changes her mind and leaves the worker with a decision, 'Well, then we just throw our hands up and let the child be subject to whatever could

31

happen in mom's house with her untreated mental health condition which she acknowledges that she has, or do we detain and initiate a lawsuit?'"

The court characterized the VFM case as "evidence that Mother already understood that she was a risk to the child and needed to do the treatment."  While Veronica C. was coming in "at the eleventh hour and saying, 'I'm med[ication] compliant. Give me my baby back,'" this was not evidence that she would be compliant in the future because "she already had a situation where she had the child and was promising to be compliant and then failed to do so."

"I have no reason to believe that at this point in time if I were to return the child to the mother because she's med compliant today that she would stay med compliant tomorrow," the juvenile court said.  "She could just as easily" refuse services and say she was taking appropriate care of her son, and "then we are back to square one."

"This is a situation where Mother has to have demonstrated as having acknowledged that she has a mental health issue that has to be addressed in therapy and medication and everyone else to accept the fact that she is complying with the therapeutic regimen," concluded the court.  Only when these conditions were met "we will know that the child can be safely returned to the mother, but not until."

The court ordered monitored visits with Joaquin C. but gave DCFS discretion to liberalize visitation or even to return him to Veronica C. before the date of the review hearing "if they have demonstrative proof that the mother is complying and is safe."  The court ordered her to undergo domestic violence counseling for victims and on-demand drug testing for all

substances, including the psychotropic medication. "I'm ordering [the testing service] to test her for the meds she's saying she is on." The court ordered Veronica C. to take her medication and to go to therapy.

The court told Veronica C. that she had to prove that she was compliant before she could have her child back: "So, Mom, once you demonstrate that you are doing the therapy, you are taking the meds, we can trust that you will continue to do that, we will be in a position where we can return the child to you but not until [then]."

Veronica C.'s attorney objected to the order that Veronica C. be ordered into domestic violence counseling because she had left the prior relationship in which the violence occurred. The court agreed that if she was doing well and compliant with her medication, she did not necessarily need to finish the domestic violence program before Joaquin C. could be returned to her care, but it disagreed with counsel's assessment that Veronica C. had adequately addressed the domestic violence that she had suffered. "I disagree with you that she's addressed it," the court said, "and I disagree with you that she's addressed any of these issues. That's the whole point, her reluctance and refusal to address these issues in therapy or [with] proper medication is the reason why we are here."

## DISCUSSION

The question on appeal is whether substantial evidence supports the finding that Joaquin C. was, at the time of the hearing, a person described by section 300, subdivision (b)(1). "[W]e review both the jurisdictional and dispositional orders for substantial evidence. [Citation.] In doing so, we view the record

in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders.  Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.  [Citation.]  But substantial evidence 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.] . . . "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]' [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

A juvenile court may determine that a child is subject to the court's jurisdiction under section 300, subdivision (b)(1) if it finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child," the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or the inability of the parent to provide regular care for the minor due to the parent's mental illness, developmental disability or substance abuse.  (§ 300, subd. (b)(1).)

For many years courts described the necessary showing under section 300, subdivision (b)(1) as requiring "three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  The California Supreme Court, however, has recently held that the *Rocco M.* formulation of the first element is inaccurate.  (*In re*

34

*R.T.* (2017) 3 Cal.5th 622, ___, 2017 WL 3082219, *4.) The Supreme Court has clarified that section 300, subdivision (b)(1) does not require that a parent commit neglect or deserve blame for being unable to supervise or protect the child, only that an actual inability to provide the necessary supervision or protection exists. (*Id.* at p. ____, 2017 WL 3082219, *1, *4-*5.)

The Supreme Court's decision in *In re R.T., supra*, 3 Cal.5th 622, however, does not alter or eliminate the fundamental statutory requirement that DCFS must prove that the parent was unable to protect or supervise the child; failed to provide the child with adequate food, clothing, shelter, or medical treatment; or was unable to provide regular care for the child due to mental illness, developmental disability or substance abuse. In light of the Supreme Court's guidance, we understand section 300, subdivision (b)(1) to require DCFS to demonstrate three elements by a preponderance of the evidence: (1) one or more of the statutorily-specified omissions in providing care for the child (inability to protect or supervise the child, the failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or inability to provide regular care for the child due to mental illness, developmental disability or substance abuse); (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness. (See *In re Rocco M., supra*, 1 Cal.App.4th at p. 820; *In re R.T., supra*, 3 Cal.4th at p. ___, 2017 WL 3082219, *4.)

The parties and the court in this case have focused on Veronica C.'s mental condition and the question of future risk rather than the threshold issue of whether Veronica C. had failed to supervise, protect, or provide regular care to Joaquin C. In the allegations supporting the dependency petition, DCFS did not

contend that Joaquin C. had received inadequate care from his mother—indeed, the allegation did not mention him at all except for the conclusory assertions that he was endangered and at risk. Instead, the text of the allegation concerned Veronica C.'s mental health history and the conclusion that her mental health problem posed a risk to Joaquin C.[5] At the adjudication hearing, DCFS argued that the petition should be sustained because Veronica C. was mentally ill and had been for some time, because she did not fulfill the VFM plan, and because her therapist thought she needed to see a psychiatrist. The juvenile court appeared to conclude that Veronica C.'s failure to promptly treat her mental illness with medication placed Joaquin C. at risk of harm. On appeal, DCFS, Veronica C., and Joaquin C. all focus on the issue of whether Veronica C.'s mental illness created a substantial risk of harm to Joaquin C. This focus on a possible risk of future

---

[5]     The allegation read as follows: "The child, Joaquin [C.]'s mother, Veronica C[.], has mental and emotional problems, including delusional thoughts, paranoia and bizarre behavior, which renders the mother unable to provide regular care of the child. On a prior occasion, the mother was hospitalized for the evaluation and treatment of the mother's psychiatric condition. Remedial services have failed to resolve the mother's problems in that the mother has failed to seek psychiatric treatment for the mother's mental health problems. Such mental and emotional condition [*sic*] on the part of the mother endangers the child's physical health and safety and places the child at risk of serious physical harm and damage." A dependency petition must contain a "concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).)

harm[6] obscures DCFS's failure to prove that Veronica C. had ever engaged in conduct of the type specified by section 300, subdivision (b)(1): the agency did not produce evidence that Veronica C. had ever failed to adequately supervise or protect Joaquin C.; that she had ever failed to provide him with adequate food, clothing, shelter, or medical treatment; or that she had ever demonstrated an inability to provide regular care to him because of her mental illness.[7] (§ 300, subd. (b)(1).) Indeed, all evidence was to the contrary.

The evidence was uncontroverted that Joaquin C. was healthy, well cared for, and loved, and that Veronica C. was raising him in a clean, organized home with family support. DCFS identified as particular strengths of the family that Veronica C. was "attentive and caring towards the child," that she was "responsible," and that she had "a strong bond" with Joaquin C. Joaquin C. "appeared well taken care of." Over and over social workers described Joaquin C. as appropriately dressed and well-groomed. He was never reported to be dirty or unkempt; he bore no marks or bruises; and he was always found to be in good health. There was never an allegation or evidence that Joaquin C. had been left alone or unsupervised. Veronica C.

---

[6] We are aware that most dependency cases concerning jurisdiction over the children of mentally ill parents focus on the risk of harm, but that is because the first element, parental conduct within one of the categories set forth in section 300, subdivision (b)(1), is typically demonstrated; indeed, it is frequently the basis for the initial DCFS referral.

[7] As there was no indication in the record that Veronica C. had a developmental disability or substance abuse problem, we do not discuss these conditions further.

was observed feeding Joaquin C. and changing his diapers. Repeatedly Joaquin C. was described by DCFS as a happy baby who was strongly bonded with his mother. He made eye contact with others and smiled often and easily, and he was comfortable in his mother's arms. Both Olivia M. and Patricia C. confirmed that Veronica C. was providing excellent care to her son, and Veronica C.'s therapist Munoz told DCFS that to her knowledge, even when Veronica C. was not taking psychotropic medication, she cared for Joaquin C. appropriately. Munoz called Veronica C. "very attentive" to her son's needs. Whatever Veronica C.'s mental problems might be, there was no evidence that they impacted her ability to provide adequate care for her son.[8]

Veronica C. did not fail to provide Joaquin C. with adequate food, clothing, shelter, or medical treatment. She had been breastfeeding her son, and DCFS described him as "growing age appropriately." As noted above, DCFS invariably observed that Joaquin C. was well-groomed and appropriately clothed. The stability of Veronica C.'s housing was identified as a strength of her family. The home was clean and well-organized, with functioning utilities and sufficient food; and Veronica C.'s personal living space within the home was also clean, organized, and appropriately furnished. Veronica C. took Joaquin C. to the pediatrician and had him vaccinated. Joaquin C. had no observed medical, developmental, or emotional problems.

---

[8] The closest thing in the record to a complaint about Veronica C.'s parenting was DCFS's report that during one visit she used her teeth to trim Joaquin C.'s nails. DCFS did not consider this a serious issue, as it described the visit as having gone well and without problems; DCFS did not express any concern that she would not follow its direction to use an alternative method to trim his nails in the future.

Not only was Veronica C. caring appropriately for her son, but also she had what DCFS praised as "a strong family support system." She lived with her mother and sister, both of whom provided support and help when she needed it. DCFS observed that Veronica C. had a good relationship with Olivia M. and Patricia C., and that they "provided support and encouragement" to her" DCFS documented several instances in which Olivia M. or Patricia C. intervened to calm and focus Veronica C. when she became distressed during interactions with social workers. Patricia C. was working with Veronica C.'s therapist to learn more about Veronica C.'s condition, and she was very involved in her treatment, attending therapy sessions and asking questions. Family members attended multiple CFT meetings with Veronica C. and came to court hearings.

All that remains is Veronica C.'s mental illness. The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child. (See., e.g., *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) "It cannot be presumed that a mother who is proven to be [mentally ill] will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less than socially acceptable and yet they are loving and compassionate parents. Conversely, there are parents who always exhibit socially acceptable behavior publicly, but whose children have parent-induced psychological and emotional problems their entire lives." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 541-542 [considering finding of detriment where mother had schizophrenia].) DCFS provided ample evidence of Veronica C.'s mental illness, but it did not

prove that her condition rendered her unable to adequately supervise, protect, or provide regular care for her son.

The juvenile court justified its exercise of jurisdiction over Joaquin C. on two grounds: Veronica C. had "agreed she needed treatment in order to take care of her child adequately," and her agreement to mental health services constituted evidence that she "understood she was a risk to the child." The record is devoid of factual support for these findings. DCFS reported that Veronica C. agreed to go to therapy "to help her feel better" after the traumas of domestic violence and losing custody of her older children, and there was no discussion about needing therapy to care properly for Joaquin C. From the record before us[9] her willingness to accept mental health services did not include an acknowledgment that she was a risk to Joaquin C. or that she was unable to provide care for him. Throughout the dependency proceeding she maintained that she was providing excellent care to her son. We caution against treating a parent's willingness to accept services as evidence or an admission that the parent cannot provide adequate supervision, protection, and care. Such a practice would compel parents to refuse all family preservation services or risk being deemed to have conceded dependency jurisdiction over their children, an outcome antithetical to the purpose of providing these services.

The evidence also does not support the juvenile court's assertion that Veronica C. refused mental health treatment. Veronica C. agreed to therapy as soon as Banuelos told her it had been recommended by the UFA. She completed her initial telephone assessment the same day as the CFT meeting in February 2016. She soon began going to therapy, and even when

---

[9] No VFM plan documents were provided to this court.

40

she declined other services she wanted to continue and did continue therapy. The evidence shows that she missed and rescheduled one session, and she was mistaken about the time of another, but her own therapist did not consider her a "no-show" and advised DCFS that she deserved credit for appearing. The record also reflects that Veronica C. did not want to see a psychiatrist, but that she did so nonetheless; and as soon as Joaquin C. was detained in foster care and breastfeeding was no longer an option, she promptly began taking the psychotropic medications her psychiatrist prescribed.

"[T]he circumstances under which the juvenile court is authorized to take jurisdiction of a child are narrowly defined." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) DCFS did not satisfy its burden under section 300, subdivision (b)(1) to prove that Veronica C. had failed to adequately supervise or protect Joaquin C. or that her mental illness rendered her incapable of providing regular care to him. Accordingly, the juvenile court's conclusion that Joaquin C. was a dependent child of the superior court was unsupported by substantial evidence and its jurisdictional finding must be reversed.[10] "In light of our

---

[10] Two additional appeals are pending in this case, one of which is still at the briefing stage. Although our reversal of the judgment has rendered these appeals moot, we note that one of the subsequent orders in this matter demonstrated that the juvenile court no longer had concerns about Veronica C.'s mental health but nonetheless continued to refuse return of the child. In its minute order of May 22, 2017, which we judicially notice, the juvenile court found that Veronica C. "is in substantial compliance with the court-ordered case plan, and the only barrier to return of the child is the parent's homelessness." A parent's homelessness is not a valid reason to assume dependency

41

determination that the jurisdictional order must be reversed, the dispositional and all subsequent orders . . . are moot." (*Id*. at p. 1137.)

## DISPOSITION

The judgment is reversed. The juvenile court is ordered to enter an order dismissing the dependency petition.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.


---

jurisdiction over a child, nor is it a legitimate basis for refusing an otherwise fit parent custody of his or her child. (See, e.g., § 300, subd. (b)(1) ["A child shall not be found to be a person described by this subdivision solely due to the lack of an emergency shelter for the family"]; *In re P.C.* (2008) 165 Cal.App.4th 98, 103-108 [reversing termination of parental rights where offending parent had resolved all issues that initially led to jurisdiction and later findings of detriment were based exclusively on her homelessness].) It is highly regrettable that the erroneous declaration of dependency and unnecessary removal of Joaquin C. from Veronica C.'s custody has been compounded by a refusal to return him to her care.

Filed 9/20/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOAQUIN C., a Person Coming Under the Juvenile Court Law. | B277434 |
| | (Los Angeles County Super. Ct. No. DK18273) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Respondent, | |
| v. | |
| VERONICA C. et al., | |
| Appellants. | |

THE COURT:

The opinion in this case filed September 1, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request by appellant pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.,                ZELON, J.,                SEGAL, J.

2