Filed 8/28/20  In re Y.T. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Y.T., et al., Persons Coming Under the Juvenile Court Law. | B301141 |
| | (Los Angeles County Super. Ct. No. 19CCJP05186) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN APPELLATE JUDGMENT] |
| v. | |
| R.G., | |
| Defendant and Appellant. | |

THE COURT:

The opinion filed on August 12, 2020 and not certified for publication, is modified as follows:

On page 14:  The following sentence is added before the last sentence of the carryover paragraph that ends Discussion

section A and states, "R.G.'s appeal from the disposition order regarding Y.T. is moot.":

> And R.G. does not challenge the custody order as to Y.T., arguing instead that she does not have to challenge it:  "While challenging the underlying issues [that] created the custody orders, she does not have to separately challenge the custody orders."

Appellant's petition for rehearing is denied.

This order does not change the appellate judgment.

| | | |
|---|---|---|
| PERLUSS, P. J. | SEGAL, J. | FEUER, J. |

2

Filed 8/12/20  In re Y.T. CA2/7 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Y.T., et al., Persons Coming Under the Juvenile Court Law. | B301141 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.G.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP05186) |

APPEAL from orders of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Dismissed in part, affirmed in part, and reversed in part.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

R.G. appeals from the juvenile court's jurisdiction findings and disposition order declaring her children, Y.T. and Aaron H., dependents of the juvenile court, removing them from her custody, and placing them with their respective fathers. R.G. contends substantial evidence did not support the court's findings under Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] that R.G.'s mental health and incidents of domestic violence between R.G. and Aaron's father placed the children at a substantial risk of serious physical harm and endangered their physical health and safety. R.G. also contends that the juvenile court abused its discretion by declaring the children dependents rather than ordering informal supervision pursuant to a voluntary plan under section 360, subdivision (b), and that there were reasonable means to avoid their removal.

The Los Angeles County Department of Children and Family Services argues R.G.'s appeal is moot with regard to Y.T. because the juvenile court terminated jurisdiction over Y.T. following a custody order. We agree the custody order rendered moot R.G.'s appeal from the disposition order concerning Y.T.,

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

but because the custody order was based on the juvenile court's jurisdiction findings, we reach the merits of her appeal from those findings. We conclude that, although substantial evidence did not support the court's jurisdiction findings under section 300, subdivision (a), substantial evidence did support the court's jurisdiction findings under section 300, subdivision (b). With regard to the disposition order relating to Aaron, we conclude that the juvenile court did not abuse its discretion in ordering formal supervision as opposed to a voluntary plan and that substantial evidence supported the court's removal of Aaron from R.G.'s custody.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Department Detains Y.T. and Aaron*

R.G. has two children, 15-year-old Y.T., whose father is Nelson T., and 3-year-old Aaron, whose father is R.G.'s husband, Antonio H. In 2013 R.G. began receiving mental health services for "Major Depressive Disorder, Recurrent, Severe with Psychotic Features . . . and Post Traumatic Stress Disorder." R.G.'s symptoms included anxiety, nervousness, shaking, paranoia, and insomnia. Her treatment included medication and individual counseling. Antonio supported R.G. by reminding her to take her medication and taking her to the hospital when her symptoms became "overwhelming." R.G. was hospitalized for her mental health condition approximately five times. R.G.'s mother lived with the family and cared for Y.T. and Aaron. Antonio said that, "as a precaution," neither he nor R.G.'s mother left Aaron alone with R.G. A neighbor who knew about R.G.'s condition would call

3

Antonio whenever the neighbor had concerns about R.G.'s mental health.

In March 2019 doctors changed R.G.'s medication, and Antonio noticed R.G. became "increasingly 'irritable.'" R.G. stopped allowing Antonio to accompany her to doctors' appointments, and she did not take her medication regularly. On April 1, 2019 R.G. and Antonio argued in front of Y.T. and Aaron about R.G.'s failure to take her medication. Antonio attempted to leave the house with Aaron, and R.G. tried to stop him. While Antonio held Aaron, R.G. scratched Antonio with sufficient force to rip his shirt. Police arrived and arrested R.G. for willful infliction of corporal injury (Pen. Code, § 273.5, subd. (a)), but Antonio did not want to press charges. R.G. blamed Antonio for her arrest, told him she wanted a divorce, and left the house with her mother and Y.T. R.G. wanted to take Aaron with her as well, but Antonio "did not allow her to take him."

After spending two days with friends, Y.T. went to live with her father. R.G. and her mother stayed with the friends for a few days, moved to a shelter, and then lived in a car before returning to live with Antonio and Aaron in June 2019. R.G. said she missed Aaron and needed to see him. A week later, on June 18, 2019, a neighbor called Antonio at work and told him R.G. was walking in the middle of the street, talking to herself and yelling at dogs. A neighbor also saw R.G. "cleaning the driveway and loudly talking to herself." The neighbor called police, but the responding officers left after they did not find R.G. at home. When Antonio arrived home, he tried to persuade R.G. to go to the hospital. R.G. initially agreed to go to the hospital after dinner, but later she resisted, screamed, and threw objects inside the house. A neighbor again called the police, who arrived to find

4

Antonio restraining R.G. by holding down her arms and legs. The police placed R.G. on a psychiatric hold and took her to a hospital, which transferred her to a residential mental health facility the next day. R.G. remained there for 17 days.

A psychiatric social worker told the Department that R.G. was crying and "rambl[ing]" incoherently while she was at the mental health facility. R.G. could not identify her diagnosis, but said she had not been taking her prescribed medication. Paperwork from the hospital indicated R.G. had been diagnosed with "Bipolar Disorder (Manic with Psychotic Features)." The psychiatric social worker said R.G. accused Antonio of sexually abusing Aaron and said he was a "'bad guy,'" but the social worker "did not know how truthful mother was being." Antonio denied all allegations of sexual abuse, and subsequent assessments of Aaron did not indicate any such abuse.

On July 10, 2019 R.G. returned home, but soon stopped taking her medication again because she said "it made her 'heart beat rapidly' and caused her to have 'trouble breathing.'" R.G. said she and Antonio continued to argue, and she had trouble sleeping and saw a "shadow" in her room, which she once tried to stab with a pen. R.G. said Aaron was usually present during her arguments with Antonio. Six days after R.G. returned home, Antonio took R.G. back to the hospital where she voluntarily admitted herself. R.G. returned home again on July 23, 2019.

During an interview with a case social worker on July 24, 2019, R.G. said she did not know why Antonio wanted to take her back to the hospital. R.G. also said Antonio and her neighbors were "'out to get'" her and were "plotting to take away Aaron from her and kick her out of the home." R.G. said that Antonio had never physically assaulted her before attempting to force her to

5

go to the hospital, but that he touched her "in an effort to get her to 'hit' him." R.G. said that she filed for divorce in May 2019, but that she thought the court dismissed her petition because she was hospitalized and missed a court date. R.G. also requested a restraining order against Antonio in May 2019, which Antonio successfully opposed.

R.G. said she has a "history of struggling with anxiety" and was enrolled in outpatient mental health services that included medication management. She failed to follow up with her doctor after her most recent discharge, however, because she said she had no transportation, yet she acknowledged she could take a bus to the facility. She also said her doctor told her to take her medication "as needed," even though the prescription indicated she should take the medication every day. R.G. said she believed "God would ultimately 'cure her' and relied on prayer." She said she had been hospitalized in the past when her symptoms had "become overwhelming," but her more recent hospitalizations occurred because Antonio "yells at her and calls her 'crazy.'"

On August 9, 2019 the Department detained Y.T. and Aaron from R.G.'s custody, and R.G. made plans to leave the family home. Other than the April 1, 2019 and June 18, 2019 incidents, neither Antonio nor R.G. reported any instances of domestic violence, nor did either of them have a criminal record or suffer from alcohol or drug abuse. The Department reported Y.T. and Aaron were healthy, were current with their vaccinations, and showed no signs of abuse or neglect. Antonio said he never witnessed any "harmful interactions" between R.G. and the children.

Y.T. told a case social worker that living with R.G. was "'stressful'" and "'difficult'" and that she worried how exposure to

R.G.'s frequent "'meltdowns' would affect Aaron."  Y.T. said R.G. and Antonio frequently argued about R.G.'s failure to take her medication and about money.  Y.T. said R.G. did not take her medication consistently "because she believes that 'God is going to heal her.'"  Y.T. said that she felt safe and well cared for while she was living with R.G. and Antonio and that she never observed any marks or bruises on Aaron that would indicate abuse or neglect.

B.  *The Department Files a Petition Under Section 300, Subdivisions (a) and (b)*

On August 13, 2019 the Department filed a petition alleging one count under section 300, subdivision (a), and two counts under section 300, subdivision (b).  The Department alleged Y.T. and Aaron came within the jurisdiction of the juvenile court as a result of a history of violent altercations between R.G. and Antonio in the presence of the children and R.G.'s history of mental and emotional problems. The Department also alleged Antonio failed to protect Aaron despite knowing about R.G.'s mental and emotional problems because Antonio allowed R.G. to reside in the child's home "and to have unlimited access to the child."  On August 14, 2019 R.G. agreed to submit to a psychological evaluation.

During an interview with a case social worker on September 6, 2019, R.G. said that her divorce from Antonio was proceeding, but that Antonio wanted her to return home.  Antonio indeed told a social worker that he and R.G.'s mother could help R.G. if she moved back home and that he did not understand "why they [were] going to court."  He said that he had not received any paperwork about a divorce and that he saw R.G.

every day outside the house.  R.G. said "she could return" to live with Antonio if she were allowed to take care of the children.

R.G. said she was taking her medication, which both Antonio and R.G.'s mother confirmed.  According to the mental health center where R.G. had been receiving services since 2013, R.G. saw her treating psychiatrist on January 18, February 15, March 1, May 14, and June 6, 2019.  R.G. said that she had appointments scheduled for June 16 and July 19, 2019, but that she missed them because she was hospitalized on those dates (even though she was hospitalized only on the latter date).  A supervisor from the health center informed the Department that R.G. also failed to attend appointments on June 28 and September 6, 2019.  R.G. also did not submit to the court-ordered mental health assessment.

C. *The Juvenile Court Makes Jurisdiction Findings and Disposition Orders, and Terminates Jurisdiction over Y.T.*

At the September 30, 2019 jurisdiction and disposition hearing, R.G. asked the court to dismiss counts a-1 and b-1 based on domestic violence and argued the incidents underlying those allegations were "not due to harmful behaviors" but resulted from R.G.'s "illness."  R.G. also asked the court to dismiss count b-2 based on her mental health and argued that neither child was harmed as a result of her mental condition and that her condition had stabilized.  Antonio asked the court to strike the allegations against him because he behaved reasonably under the circumstances.

The juvenile court concluded R.G. suffered from mental health and emotional problems that placed the children at risk

8

because R.G.'s condition "manifested itself in violent behaviors." The court sustained all three counts with amendments to remove allegations against Antonio from the petition, and the court dismissed the petition with respect to him.[2] As amended, the sustained counts a-1 and b-1 alleged that the history of violent altercations between R.G. and Antonio in the presence of the children endangered the children's physical health and safety and placed the children at risk of serious physical harm, damage, and danger.[3] Sustained count b-2 alleged that R.G.'s history of mental and emotional problems rendered R.G. unable to provide

---

[2]     The record on appeal includes only the jurisdiction and disposition order pertaining to Y.T. We take judicial notice of the September 30, 2019 jurisdiction and disposition order pertaining to Aaron pursuant to Evidence Code sections 452 and 459.

[3]     As sustained, counts a-1 and b-1 stated: "The children['s] . . . mother, [R.G.,] and the mother's male companion, Antonio [H.], father of the child Aaron, have a history of engaging in violent altercation[s] in the presence of the children. In April of 2019, the mother pulled and ripped [Aaron's] father's shirt inflicting a scratch to [Aaron's] father's chest while [Aaron's] father held the child Aaron. On 06/18/2019, the mother attempted to strike and kick [Aaron's] father. [Aaron's] father wrapped [his] arms around the mother's body and threw the mother to the ground. [Aaron's] father pinned the mother to the ground inflicting scratches to the mother's back and arms. Such violent conduct on the part of the mother endangers the children's physical health and safety, and places the children at risk of serious physical harm, damage and danger."

9

regular care of the children.[4]  Count b-2 also alleged that R.G. failed to take psychotropic medication as prescribed and was hospitalized to treat her psychiatric condition and that her mental and emotional condition endangered the children's physical health and safety and placed them at risk of "serious physical harm, damage, danger and failure to protect."

Regarding disposition, R.G. argued a voluntary plan under section 360, subdivision (b), was appropriate for Aaron because, even before the Department's intervention, the family had a safety plan in place to protect Aaron.  Aaron's grandmother could continue to be Aaron's primary caregiver, and the Department had already approved her to monitor visits between R.G. and Aaron.  The Department argued supervision was necessary because R.G. had been receiving treatment for her mental health condition since 2013, yet she continued to have problems that resulted in the incidents of April and June 2019 and had been hospitalized multiple times in recent months.  The Department also argued R.G. had not consistently attended appointments

---

[4]     As sustained, count b-2 stated:  "The children['s] . . . mother, [R.G.,] has a history of mental and emotional problems, including a diagnosis of Bi-Polar Disorder, manic with psychotic feature, Major Depressive Disorder recurrent, severe with psychotic features, Post Traumatic Stress Disorder and anxiety, which renders the mother unable to provide regular care of the children.  The mother failed to take the mother's psychotropic medication as prescribed.  On 07/16/2019, 06/18/2019, and on prior occasions, the mother was hospitalized for the evaluation and treatment of the mother's psychiatric condition.  Such mental and emotional condition on the part of the mother endangers the children's physical health and safety, and places the children at risk of serious physical harm, damage, danger and failure to protect."

10

with her psychiatrist and had not submitted to the court-ordered psychological assessment. Moreover, R.G. had been living in her car, and counsel for Antonio told the Department that Antonio was "sympathetic" to her situation. The Department argued supervision was necessary to ensure Aaron's safety if R.G. returned home before her mental health condition stabilized.

Counsel for Y.T.'s father Nelson asked the court to place Y.T. with Nelson, terminate jurisdiction over Y.T., grant Nelson sole physical custody of Y.T., and grant Nelson and R.G. joint legal custody of Y.T. Counsel for R.G. did not address disposition with regard to Y.T.

The court found R.G.'s mental condition was unstable, declared the children dependents of the court, and found by clear and convincing evidence it was necessary to remove the children from R.G.'s custody because there was a substantial danger to the children if left in her custody and there were no reasonable means to protect them without removing them from her care and custody. The court released Y.T. to her father and terminated jurisdiction, granted Nelson sole physical custody, granted Nelson and R.G. joint legal custody, and ordered unmonitored visitation for R.G. The court stayed the disposition order pending receipt of a juvenile custody order, which occurred on October 4, 2019. The court placed Aaron with Antonio and ordered monitored visits for R.G. The court also ordered R.G. to take all prescribed medication, submit to a psychiatric evaluation, and attend individual counseling to address her mental health and domestic violence issues. R.G. timely appealed the jurisdiction findings, the disposition orders, the order terminating jurisdiction over Y.T., and the custody and visitation order concerning Y.T.

11

**DISCUSSION**

A.   *R.G.'s Appeal from the Jurisdiction Findings*
     *Regarding Y.T. Is Not Moot, but Her Appeal from the*
     *Disposition Order Is*

The Department argues R.G.'s appeal with respect to Y.T. is moot.  R.G. argues her appeal is not moot because, among other reasons, "the court's assumption of jurisdiction created [the] custody orders."

An appeal is moot if the reviewing court cannot grant effective relief.  (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054; see *In re N.S.* (2016) 245 Cal.App.4th 53, 60 ["the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].)  An order terminating juvenile court jurisdiction generally renders an appeal from a previous order moot.  (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)  However, "'"[a]n issue is not moot if the purported error infects the outcome of subsequent proceedings"'" (*In re E.T.* (2013) 217 Cal.App.4th 426, 436) or "'"could have other consequences for [the appellant], beyond jurisdiction"'" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 309; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763).  For example, an appeal from jurisdiction findings is not moot where the sustained findings have an adverse effect on custody or visitation rights.  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432; *In re C.C.*, at p. 1488; *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.)

The juvenile court's termination of jurisdiction does not moot R.G.'s appeal because the court issued a custody order adverse to R.G. based on the jurisdiction findings. (See *In re J.K.*, *supra*, 174 Cal.App.4th at pp. 1431-1432 [even though the juvenile court terminated jurisdiction, the father's "challenge to the jurisdictional findings [was] not moot" because "the sustained jurisdictional findings against [him] have had an adverse effect on his custody rights"]; *In re Joshua C.*, *supra*, 24 Cal.App.4th at p. 1548 [where the juvenile court issued restrictive visitation and custody orders based on the jurisdiction findings, "[t]he fact that the dependency action has been dismissed should not preclude review of a significant basis for the assertion of jurisdiction where exercise of that jurisdiction has resulted in orders which continue to adversely affect appellant"]; cf. *In re N.S.*, *supra*, 245 Cal.App.4th at p. 61 [appeal was moot where the jurisdiction findings were not the basis of the custody and visitation order].) Because the jurisdiction findings were the basis for the custody and visitation order here, any "error in the former undermines the foundation for the latter." (*In re Joshua C.*, at p. 1548.)

A juvenile court's custody and visitation order (commonly known as an "exit order"),[5] however, supersedes disposition

---

[5] Section 362.4, subdivision (a), provides that, if a juvenile court terminates jurisdiction over a case, the court may issue "an order determining the custody of, or visitation with, the child." Section 362.4, subdivision (c), provides: "If no action is filed or pending relating to the custody of the minor in the superior court of any county, the juvenile court order may be used as the sole basis for opening a file in the superior court . . . ." "Custody and visitation orders issued under section 362.4 are sometimes referred to as 'family law' orders or 'exit' orders." (*In re Ryan K.* (2012) 207 Cal.App.4th 591, 594, fn. 5.)

orders. (See *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1165 ["the exit order 'shall be a final judgment and shall remain in effect after [the juvenile court's] jurisdiction is terminated'"]; see also § 362.4, subd. (b) [custody and visitation orders "continue until modified or terminated by a subsequent order of the superior court"].) The disposition order pertaining to Y.T. no longer adversely affects R.G., and nothing we could do in this appeal can grant her any relief from an order that essentially no longer exists. (See *In re E.T.*, *supra*, 217 Cal.App.4th at p. 436 ["[a]n appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief"].) R.G.'s appeal from the disposition order regarding Y.T. is moot.

B.    *Applicable Law and Standard of Review*

"At the first stage of dependency proceedings, the juvenile court determines whether [a] child is subject to juvenile court jurisdiction; [the Department] has the burden to prove jurisdiction by a preponderance of the evidence." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "At the second stage, the juvenile court must decide where the child will live while under juvenile court supervision; to support removal from parental custody, [the Department] has the burden to prove by clear and convincing evidence that there is a risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety." (*Ibid.*; see § 361, subd. (c); *In re D.P.* (2020) 44 Cal.App.5th 1058, 1068; *In re D.C.* (2015) 243 Cal.App.4th 41, 51, 54.)

We review challenges to the sufficiency of the evidence underlying jurisdiction findings and disposition orders for

14

substantial evidence.  (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992; see *In re I.J.* (2013) 56 Cal.4th 766, 773.)  "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'"  (*In re I.J.*, at p. 773; see *In re S.R.* (2020) 48 Cal.App.5th 204, 219.)

"'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'"  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re D.C.*, *supra*, 243 Cal.App.4th at p. 52.)  "'But substantial evidence "is not synonymous with any evidence. [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal."'"  (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)  "'"Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence."'"  (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420; see *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093 [a "juvenile court's conclusion 'supported by little more than speculation' [is] not based on substantial evidence"].)  The appellant has the burden to show there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re D.C.*, at p. 52; *In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

C.     *Substantial Evidence Did Not Support Jurisdiction Under Section 300, Subdivision (a)*

Section 300, subdivision (a), provides for juvenile court jurisdiction when a child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally by the child's parent.  Because neither Y.T. nor Aaron suffered serious physical harm, the Department had to show there was a substantial risk the children would suffer serious physical harm inflicted nonaccidentally in the future. (See *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.)  In making that determination, the juvenile court may consider "the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm."  (§ 300, subd. (a).)  "Nonaccidental" generally means a parent "acted intentionally or willfully."  (*In re R.T.* (2017) 3 Cal.5th 622, 629.)

There was no evidence suggesting R.G. ever inflicted any injuries on Y.T. or Aaron, accidentally or otherwise.  Nor was there evidence of the type of "other actions" courts have cited as indicating a child is at risk of suffering serious physical harm inflicted nonaccidentally in the future.  For example, in *In re Giovanni F.* (2010) 184 Cal.App.4th 594, on which the Department relies, the court held a father's history of violent attacks on his child's mother in the child's presence,[6] his denial

---

[6]     The court described this history as follows:  "[Father] was violent with [Mother] throughout their two-and-one-half-year relationship.  He hit, slapped and beat her.  He blackened her

16

he was violent, his refusal to comply with a safety plan, and his violation of a restraining order justified jurisdiction under section 300, subdivision (a). (*Id.* at pp. 599-601.) The physical altercations between R.G. and Antonio, as the Department concedes, were relatively few and far less severe. R.G. became violent on only two occasions when she changed or failed to take her medication, and in one of those instances, when R.G. threw unspecified objects inside her home, no one was injured. This evidence did not support the juvenile court's finding of a substantial risk R.G. would inflict serious physical harm nonaccidentally on Y.T. or Aaron. (See *In re Isabella F.* (2014) 226 Cal.App.4th 128, 138-139 [substantial evidence did support jurisdiction under section 300, subdivision (a), based on an "isolated incident" where the mother hit or scratched her 10-year-old daughter's face, grabbed her by the neck, and locked her in the bathroom when she refused to go to school].)

D. *Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings Under Section 300, Subdivision (b)(1)*

R.G. contends substantial evidence did not support the juvenile court's findings under section 300, subdivision (b)(1), that her mental health condition and the domestic violence between her and Antonio endangered the children's physical

---

eye, bloodied her nose and choked her. He left her bruised and scarred. He called her demeaning names. He threatened to kill her. [Father] was violent with [Mother] even while he was driving. On one such occasion, he hit her in the stomach, then left her stranded." (*In re Giovanni F.*, *supra*, 184 Cal.App.4th at p. 599.)

17

health and safety and placed them at risk of "serious physical harm, damage, danger and failure to protect."  Section 300, subdivision (b)(1), provides for juvenile court jurisdiction when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [the] parent . . . to adequately supervise or protect the child, or . . . to provide regular care for the child due to the parent's or guardian's mental illness . . . ."  A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove (1) the parent's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.  (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 848; *In re Joaquin C.*, *supra*, 15 Cal.App.5th at p. 561; see *In re R.T.*, *supra*, 3 Cal.5th at p. 624.)

"In deciding whether there is a substantial risk of serious physical harm, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the adjudication hearing.  'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'"  (*In re Roger S.* (2018) 31 Cal.App.5th 572, 582; see *In re J.M.* (2019) 40 Cal.App.5th 913, 921 ["Where jurisdictional allegations are based solely on risk to the child, and not on past injury, a juvenile court ordinarily determines whether a substantial risk of harm exists at the time of the jurisdiction hearing."].)  "'To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'"  (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)  The

Department has the burden to prove by a preponderance of the evidence a child is at substantial risk of serious physical harm. (*In re Joaquin C., supra*, 15 Cal.App.5th at p. 561.)

      1.     *Substantial Evidence Supported the Juvenile Court's Finding That R.G.'s Mental Condition Created a Substantial Risk of Serious Physical Harm*

R.G. makes several arguments to challenge the juvenile court's finding that her mental condition created a substantial risk of serious physical harm to Y.T. and Aaron. First, she argues that the evidence she had a mental health condition and was willing to seek out and accept treatment for that condition was insufficient to establish jurisdiction under section 300, subdivision (b)(1). R.G. is correct that neither her mental illness nor her willingness to accept treatment, without more, justified jurisdiction under section 300, subdivision (b)(1). (See *In re A.L.* (2017) 18 Cal.App.5th 1044, 1049-1051 [mother's schizophrenia, without more, did not create a substantial risk of physical harm for her children]; *In re Joaquin C., supra*, 15 Cal.App.5th at p. 563 ["The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child."]; *id.* at p. 564 ["We caution against treating a parent's willingness to accept services as evidence or an admission that the parent cannot provide adequate supervision, protection, and care."]; *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226-1227 ["'Harm to a child cannot be presumed from the mere fact the parent has a mental illness.'"].)

But there was far more evidence than R.G.'s diagnosis and willingness to be treated, and it showed that R.G. was not always

19

willing to accept treatment. The court emphasized that R.G.'s condition "manifested itself in violent behaviors," including the April 2019 incident where R.G. scratched Antonio while he held Aaron and the June 2019 incident where R.G. threw objects inside the house. Moreover, R.G. was involuntarily hospitalized for almost three weeks, and voluntarily hospitalized for almost another week, as a result of changes to her medication or her failure to take it, and R.G. missed three therapy appointments in a span of three months. R.G.'s illness and her failure to treat it consistently put Y.T. and Aaron in situations where they were at a substantial risk of serious physical harm. (See *In re Travis C.*, *supra*, 13 Cal.App.5th at p. 1226 [jurisdiction under section 300, subdivision (b)(1), was appropriate where the "[m]other's illness and her failure to consistently treat it have already put [her children] into situations where they were at a substantial risk of serious physical harm"].) Substantial evidence supported the juvenile court's finding that R.G.'s mental condition created a substantial risk of serious physical harm to Y.T. and Aaron.

Second, R.G. argues jurisdiction was inappropriate because the family was "well-equipped to handle" R.G.'s mental health issues. In particular, she cites evidence the children's fathers, her mother, and a neighbor were available to provide or help provide care for the children. R.G. cites cases reversing jurisdiction findings where a parent's mental health condition posed no danger to the children in part because another parent or guardian was available to care for the children. (See *In re A.L.*, *supra*, 18 Cal.App.5th at p. 1051; *In re James R.* (2009) 176 Cal.App.4th 129, 136-137; *In re Janet T.* (2001) 93 Cal.App.4th 377, 385.) But that was not the case here. Despite Antonio's efforts, R.G. came perilously close to injuring Aaron by ripping

open Antonio's shirt while Antonio held Aaron and by throwing objects inside the house. And although Y.T. moved out of her mother's home before the June 2019 incident, there was nothing to keep her from returning to live with R.G. or to keep R.G. from taking her, as she did in April 2019, to live with a friend or elsewhere.

Third, R.G. argues that, at the time of the jurisdiction hearing, her condition had stabilized and she was taking her medication, getting treatment, and working. But R.G. missed several therapy appointments, including one just a few weeks before the jurisdiction hearing. In addition, it is not clear whether R.G.'s statement she was taking her medication meant she was taking it as prescribed or only "as needed," as she suggested to a case social worker in July 2019. Indeed, R.G. told the same social worker she was relying on God and prayer, not her medication, to cure her. And although R.G. agreed at the August 14, 2019 detention hearing to submit to a psychiatric evaluation, she never followed through.

Finally, R.G. argues her pending divorce "would have additionally alleviated the need for court intervention" because it would have determined which parent had custody of Aaron. But R.G.'s mental condition created a present risk of harm to Y.T. and Aaron that could not await a family court custody battle. Moreover, the record does not indicate the status of R.G.'s divorce petition, and it is not even clear that R.G. continued to seek a divorce from Antonio. R.G. acknowledged Antonio wanted her to return home, and Antonio said he saw R.G. every day outside their home, even after the children were detained.

21

>    2.    *Substantial Evidence Supported the Juvenile*
>          *Court's Finding That Violent Altercations*
>          *Between R.G. and Antonio Created a*
>          *Substantial Risk of Serious Physical Harm*
>
>          a.    *R.G.'s Challenges to the Jurisdiction*
>                *Findings Based on Domestic Violence Are*
>                *Justiciable*

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; see *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 ["As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings."].)

R.G. acknowledges this general principle, but argues we should consider her challenges to the juvenile court's domestic violence findings because they could prejudice her in future dependency or family court proceedings. In particular, she argues she would be "collaterally estopped" from relitigating the juvenile court's findings in family court proceedings involving Y.T. or Aaron. Although there is no evidence of such proceedings now, they are reasonably foreseeable given that there is a family law custody order in place for Y.T. and that the family law court

22

in R.G. and Antonio's pending divorce proceeding (assuming it goes forward) may issue a custody order for Aaron. R.G. contends that in such a proceeding the juvenile court's findings based on domestic violence could give rise to a presumption against awarding her custody. (See Fam. Code, § 3044, subd. (a) ["there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child"].) While we take no position on whether a juvenile court's jurisdiction findings based on physical altercations arising from a mental health condition constitute a domestic violence finding for purposes of Family Code section 3044, we agree with R.G. that the juvenile court's jurisdiction findings based on R.G.'s violent altercations with Antonio, if erroneous, "could have severe and unfair consequences" to R.G. in family court proceedings. (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; *In re Joshua C.*, *supra*, 24 Cal.App.4th at p. 1548.) Therefore, we will consider the merits of R.G.'s appeal from the juvenile court's domestic violence jurisdiction findings under section 300, subdivisions (a) and (b).

> b. *The Juvenile Court Could Reasonably Infer That, Without Treatment, R.G.'s Mental Condition Would Continue To Cause Violent Altercations and Create a Substantial Risk of Future Physical Harm to Y.T. and Aaron*

"Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to

continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.*, *supra*, 192 Cal.App.4th at p. 717; accord, *In re M.W.*, *supra*, 238 Cal.App.4th at p. 1453.) "A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.)

Substantial evidence supported the juvenile court's finding that Y.T. and Aaron were at substantial risk of future physical harm at the time of the jurisdiction hearing. In the months preceding the Department's investigation, R.G.'s violence at home twice required police intervention, and she was hospitalized twice after changing or failing to take her medication. She failed to attend all of her therapy appointments, suggested she could take her medication only "as needed," questioned why she was hospitalized, and said Antonio caused her problems by "calling her 'crazy.'" And although R.G. moved out of the family home in April 2019 and filed for divorce in May 2019, she returned home in July 2019, only to be hospitalized again. R.G. had failed to resolve the concerns arising from her mental health condition at the time of the jurisdiction hearing.

Conditions in the home that led Antonio and R.G. to argue also went unresolved. R.G. and Antonio frequently argued, both before and after her hospitalizations. A few weeks before the jurisdiction hearing, R.G. complained to a case social worker that Antonio "was going to do everything he could to make [her] sick and take Aaron away." R.G. said she tore Antonio's shirt in April 2019 "because he started to aggravate me, about taking me to the hospital," and R.G. described Antonio as "abusive." R.G. also told the case social worker she did not want to return to live with

24

Antonio because "[t]here is domestic violence," but she nevertheless saw Antonio on a daily basis.[7]  Because R.G.'s mental condition manifested in domestic violence that placed her children at risk of physical harm in the past, and because at the time of the jurisdiction hearing R.G. had not fully committed to treatment for her mental condition, the juvenile court could reasonably infer that the conditions created by R.G.'s mental condition would continue to create a substantial risk of future physical harm to Y.T. and Aaron.  (See *In re L.W.*, *supra*, 32 Cal.App.5th at p. 850 [unless resolved, a mother's substance abuse would "spill[ ] over into areas that will pose a substantial risk of physical harm" to her child].)

R.G. argues that any risk to Y.T. was "very low" because Y.T. lived with her father and had no plans to return to live with R.G.  But nothing kept Y.T. from visiting R.G. at the family home or from moving back.  The record suggests Y.T. went to live with her father because her mother moved out of the family home in April 2019 without having another place to live, not because Y.T. no longer wanted to live with her mother.  R.G. also argues the risk to Aaron was "low" because she moved out before the detention hearing.  But R.G. previously moved out only to return again, and Antonio said he and R.G. saw each other every day.  And R.G.'s mother continued to live with Antonio and take care of

---

[7]     R.G. also argues the jurisdiction findings based on "domestic violence" cannot stand because her violent behavior resulted from her mental condition and not from anger.  Section 300, subdivision (b), however, protects children from physical harm or the risk of physical harm no matter what triggers a parent's violence, be it anger, substance abuse, a mental condition, or something else.

Aaron.  Thus, the juvenile court could infer that, without intervention, R.G. and Antonio would likely live together again or see each other frequently, and thus the potential for future violent altercations was not speculative.

E. *The Juvenile Court Did Not Abuse Its Discretion by Declaring Aaron a Dependent of the Court or Removing Him from R.G.'s Custody*

R.G. argues the juvenile court erred in declaring Aaron a dependent rather than ordering informal supervision under section 360, subdivision (b), and in removing Aaron from her custody.  R.G. has not shown either ruling was erroneous.

1. *The Juvenile Court Did Not Abuse Its Discretion in Declaring Aaron a Dependent of the Court*

"After the juvenile court finds jurisdiction pursuant to section 300, it must 'adjudicate the child a dependent unless the severity of the case warrants nothing more than [the child protective agency's] supervision of family maintenance services. . . .  [T]he court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency.'  [Citation.]  The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion."  (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 851; see *In re N.M.* (2011) 197 Cal.App.4th 159, 171 ["Once the juvenile court finds jurisdiction under section 300, it must adjudicate the child a dependent unless the severity of the case warrants nothing more

than [the child protective agency's] supervision of family maintenance services."]; see also § 360, subd. (b).) "We cannot reverse the court's dispositional order absent a clear abuse of discretion." (*In re L.W.*, at p. 851; see *In re N.M.*, at p. 171.)

The juvenile court did not abuse its discretion in declaring Aaron a dependent and ordering formal supervision. In rejecting a voluntary plan under section 360, subdivision (b), the court stated it had "concerns about [R.G.'s] ongoing mental health situation." Counsel for Aaron pointed out that, although R.G. was "trying to address her mental health issue," R.G. and Antonio's living arrangement remained unsettled, and the risk of future altercations remained. Formal supervision would ensure R.G. received necessary services. (See *In re N.M.*, *supra*, 197 Cal.App.4th at p. 171 ["a formal reunification plan would provide monitoring of [a parent's] participation in the services and reporting of their progress while a voluntary case plan would not"].) Although there was evidence R.G. cooperated with the Department and was receiving treatment, the potential for recurrence of the risk to Aaron remained.

2. *Substantial Evidence Supported Removal*

R.G. contends the court erred in removing Aaron from her custody because there were reasonable means to protect Aaron without removal. In particular, R.G. argues she articulated a plan in which Antonio, R.G.'s mother, and a neighbor would help care for Aaron and ensure his safety without removing Aaron from R.G.'s custody.

"[T]o support removal from parental custody, [the Department] has the burden to prove by clear and convincing evidence that there is a risk of substantial harm to the child if

27

returned home and the lack of reasonable means short of removal to protect the child's safety." (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992; see § 361, subd. (c).) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*In re N.M.*, *supra*, 197 Cal.App.4th at pp. 169-170.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (July 27, 2020, S254938) ___Cal.5th ___, ___ [2020 WL 4280960, p. 1].)

At the disposition hearing counsel for R.G. argued the family's safety plan for Aaron protected him from harm without removal. The juvenile court ordered removal without "stat[ing] the facts on which the decision to remove" Aaron was based, as

28

required by section 361, subdivision (e).[8]  (See *In re D.P., supra*, 44 Cal.App.5th at p. 1065.)  Although R.G. does not argue the court's failure to comply with section 361, subdivision (e), prejudiced her, any error was harmless because there was substantial evidence from which the juvenile court could have found by clear and convincing evidence that removal was proper, and it is not reasonably probable the juvenile court would have ordered an alternative to removal had the court considered other options.[9]

R.G. had removed herself from the home at the time of the disposition hearing, but nothing prevented her from moving back, either because she missed Aaron or had nowhere else to live.  (Cf. *In re D.P.*, *supra*, 44 Cal.App.5th at p. 1069 [because a restraining order effectively prevented the offending mother from returning to live with her child, removal was not necessary "to protect [the child] from the substantial harm he otherwise would face 'if [he] were returned home'"].)  Given R.G.'s past history of moving out, filing for divorce, experiencing homelessness, and returning to live with Antonio because she missed Aaron, R.G. easily could have repeated this cycle after the disposition hearing and before she resolved her mental health issues.  (See *In re*

---

[8]     Section 361, subdivision (e), provides:  "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ."

[9]     R.G. also does not argue the court failed to comply with section 361, subdivision (c)(1)(A), which provides:  "The court shall consider, as a reasonable means to protect the minor . . . .  [¶] (A) The option of removing an offending parent . . . from the home."

*Alexzander C.* (2017) 18 Cal.App.5th 438, 452 [removal was appropriate where the offending parent "had previously failed to comply with the court's orders," and the nonoffending parent had allowed the offending parent to return home "knowing she had not addressed her drug problems"], disapproved on another ground in *Conservatorship of O.B.*, *supra*, ___Cal.5th at p. ___ [p. 7, fn. 4]; *In re N.M., supra*, 197 Cal.App.4th at p. 170 [conditions in the home supported removal at the time of the disposition hearing because the offending parent "had only begun to participate in services, and it was too early to tell if he was making progress"].)


## DISPOSITION


The appeal from the disposition order regarding Y.T. is dismissed.  The jurisdiction findings regarding Y.T. and Aaron under section 300, subdivision (b), are affirmed, but the jurisdiction findings under section 300, subdivision (a), are reversed.  The disposition order regarding Aaron is affirmed.



SEGAL, J.


We concur:


30

PERLUSS, P. J.

FEUER, J.