Filed 1/28/21  In re Joseph C. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re JOSEPH C. et al., Persons Coming Under Juvenile Court Law. | B303414 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP06483A-B) |
| Plaintiff and Respondent, | |
| v. | |
| JOEY C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Kim Nguyen, Judge.  Affirmed.

Serobian Law and Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

This case arises in the context of a bitter custody battle between appellant father, Joey C., and mother, Juana C. (not a party to this appeal). In December 2019, the juvenile court found jurisdiction over their children, Joseph C. (born May 2013) and Jennifer C. (born October 2014) under Welfare and Institutions Code section 300, subdivisions (b)(1) and (c) (Sections 300(b)(1) and 300(c)) and removed them from both parents. On appeal, Father contends the court erred by: (a) finding jurisdiction under Section 300(b)(1) when the petition filed by the Los Angeles County Department of Children and Family Services (DCFS) alleged only emotional harm; (b) finding jurisdiction under Section 300(c) when the petition alleged only emotional abuse and not serious emotional damage, and when substantial evidence did not support a finding of serious emotional damage; and (c) removing the children from Father's custody when the evidence was insufficient to support a finding that they would be harmed if released to him. DCFS disagrees and additionally contends that Father has forfeited many of his arguments by failing to make them below.

2

We conclude:  (a) Father has forfeited any challenge that the language in the petition insufficiently alleges jurisdiction under Section 300(b)(1), as well as any argument that Mother's conduct insufficiently supported jurisdiction under Section 300(b)(1), but has not forfeited his challenges to jurisdiction under Section 300(c); (b) the language of the petition sufficiently alleged jurisdiction under Section 300(c), and substantial evidence supports the finding of jurisdiction thereunder; and (c) substantial evidence supports the court's order removing the children from Father.  We therefore affirm.

**STATEMENT OF RELEVANT FACTS**

### A.    *Mother Alleges Abuse*

Between May 2017 and April 2019, DCFS received at least nine reports that Father was physically abusing and neglecting the children.  All allegations were deemed inconclusive or unfounded.

On August 20, 2019, Mother reported that for approximately one year, Joseph had been "slapped in the head by both" Father and his fiancée, G.M.  Mother had taken Joseph to a pediatrician on July 30, 2019, for evaluation because he "complained of headache, nausea, stomach pain and the inside of his eye was red" but Joseph "was refusing to be examined, screamed at the pediatrician and . . . shut down and did not talk."  Joseph also allegedly told Mother that Father "was mad and made the child drink

his urine."[1]  Mother alleged both children would often return from visits with Father with rashes.  Mother also alleged Jennifer had stated she "wanted to die" because G.M. forced her to call G.M. "mother."

On September 25, 2019, the child protection hotline received a report from Mother that after returning from a visit with Father, Jennifer had touched herself in a sexual manner after Mother had bathed her.  When asked what she was doing, Jennifer allegedly explained that G.M. had touched her in a similar manner.  Jennifer said G.M. had called her "'private part a tootie'" and said, "'she touches me deep inside my tootie.'"[2]

---

[1]  On August 21, 2019, Mother brought six-year-old Joseph to the Baldwin Park Police Department to report this incident.  Once there, Joseph would not speak with the officer alone, and hid under the chair that Mother sat in.  Expressing his belief that when someone lied, "'They go to jail,'" Joseph would say only that he liked living with Mother but not with Father; he would not answer any questions about the alleged urination incident, or any questions about Father.  After speaking with Father, the Baldwin Park Police Department determined the allegations were "unfounded at this time."

[2]  Mother also took Jennifer, who was not yet five, to the Baldwin Park Police Department to report this allegation.  After Mother explained the allegations, the police officer sat next to Jennifer, who was playfully hiding under the table to have a picnic.  The officer asked her, "'How was school'"?  Jennifer responded, "'[G.M.] touched me here and went in deep'" as she pointed to her vaginal area.  Jennifer continued playing, and the officer could get no further information.  Jennifer also stated she did not know the difference between good and bad.  The officer *(Fn. is continued on the next page.)*

## B. *DCFS Hears Conflicting Stories*

### 1. First Visit with Father; Children Accuse Mother

When a children's social worker (CSW) visited Father in late August 2019, Father claimed that Mother regularly accused him of child abuse whenever he was scheduled to visit with the children. He stated he was in a "custody battle" with Mother, and had unsuccessfully tried to get full custody through family court. He denied any abuse, and explained he disciplined the children by placing them in "time out" or taking away their toys. He contended the children chose to call G.M. "mom" and Mother "Juana."

Both Joseph and Jennifer appeared healthy. When the CSW first arrived at the house, he saw them running and laughing in the front yard. Both referred to G.M. as "mom," and Mother as "Juana." Both denied abuse by Father or G.M. and, in response to a question, Jennifer said she disliked being at Mother's house because "'Juana is crazy.'" G.M. and her son (who was living with Father and G.M.) also denied Mother's allegations.

### 2. Visit with Mother; Joseph Accuses Father

When the CSW visited Mother's home in early September 2019, he saw a bruise on Joseph's back. While

---

noted that "Jennifer['s] statement was verbatim to how [Mother] explained it."

Joseph claimed not to know where the bruise came from, he now stated Father would hit him in the head. The CSW also attempted to interview Jennifer while at Mother's home, but she was running around the house and refused to answer the CSW's questions.

### 3. Second Visit with Father; Children Accuse Mother Again

A CSW visited Father's home again in late September, and again spoke with each child alone. Joseph stated he was afraid of "Juana," that she had hit him in the stomach the day before, and that she had made Jennifer and him lie to the police and to the doctor. Joseph appeared happy and had no marks or bruises. Jennifer also stated she was afraid of "Juana," and alleged that when Mother had taken Jennifer to the doctor's office, Mother instructed her to tell the doctor that G.M. was hurting her. Jennifer also alleged that Mother instructed her to tell G.M. that "she is SHIT" and to tell Father to "shut up." Jennifer reported that Mother hit her.

### 4. Third-Party Statements

DCFS spoke with the children's family law attorney in mid-September. He reported that "the children change their stories when they are with their parents regarding both parents using corporal punishment."

DCFS also received two e-mails from the children's pediatrician in September. The first stated that since March 2014, Joseph had been brought to the clinic approximately

60 times. The first abuse allegation was in June 2017, and there had been 24 visits since then. The pediatrician stated "many of the reasons he is seen are for very minor issues / rash however mother has made it a point that she wanted such things to be documented. Many of these office visit[s] occur after Joseph returns home from Dad's." The second e-mail reported that Mother had brought Jennifer to be examined for allegedly being "touched in her private area," and that Jennifer's vagina "appeared open" but there was no bleeding or tearing. The pediatrician also relayed that Jennifer had said "they" touched her "'tutti,'" but did not specify who or when.

A Baldwin Park Police Officer told DCFS that Mother had made multiple accusations of abuse against Father or G.M., and that these reports typically happened "right before a visitation exchange." The officer opined that Mother was jealous of Father's new relationship and thus made false allegations against them both. He did not think it necessary for Jennifer to receive a forensic exam.

When Father brought the children to a Hub forensic exam, both reported being afraid of Mother. Jennifer reported Mother hit her with a sandal and "touch[ed]" her "very deep on [her] 'tootie.'" However, Jennifer reported this was done with her clothes on, and that it did not hurt, just tickled.

Joseph's teacher reported that Joseph often had behavioral issues after returning from a visit to Father's

home and that Joseph had said he did not want to go to Father's home and that when he did, he missed Mother.

In October 2019, the mother of Father's other son stated she had been in a 10-year custody battle with Father over her son, and that Father had reported her to court several times. She denied any physical altercations, but stated there was some verbal abuse in their four- to five-year relationship, with a lot of fighting and screaming. She had no concerns regarding physical or sexual abuse of her son, who visited Father weekly.

### C.    *DCFS Files a Petition and Subsequently Amends It*

DCFS met with both parents and attempted to implement a safety plan, but Mother would not agree to extend any plan past October 2, 2019. DCFS therefore advised that it would seek to remove the children from her custody. The court signed an expedited removal order and the children were detained in Father's home.

Two days later, DCFS filed a petition on behalf of Joseph and Jennifer under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (d), and (j). Both parents denied the petition, and the court found a prima facie case to detain the children with Father.

In November 2019, DCFS filed a first amended petition. As with the previous petition, counts a-1, b-3, and j-2 identically alleged that Mother "physically abused . . . Jennifer" reciting that, "[o]n a prior occasion, the mother

struck the child on the buttocks with a sandal" and Jennifer was "afraid of the mother." Counts a-2, b-4, and j-3 identically alleged that Mother "struck [Joseph] in the stomach" and "[o]n prior occasions, the mother pinched the child." Counts b-2, d-1, and j-1 identically alleged Mother sexually abused Jennifer by "fondl[ing] the child's vagina over the child's clothes."

Count b-1 alleged that Mother endangered the children by subjecting them to "numerous unnecessary interviews with social workers, law enforcement officers, and doctors, as a result of the mother's allegations of abuse to the children by the father and the father's female companion, G[.] M[].," and discussed a specific doctor's visit on September 24, 2019. The count also alleged that Mother "has taken the children to the doctor approximately sixty times after the children visit with the father for possible abuse and neglect of the children by the father" and "has spoken negatively about the father in the presence of the children." The count additionally alleged that Father and G.M. "instructed the children to refer to the mother by her legal name, Juana[,] and to say that they are scared of the mother because the mother is mean to them. Further, the father failed to secure mental health services for the children." These actions placed the children "at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior towards self and others."

Count c-1 alleged both parents emotionally abused the children by engaging in an ongoing custody dispute, which included Mother making ongoing abuse and neglect allegations against Father, subjecting the children to numerous unnecessary interviews with social workers, law enforcement officers, and doctors. Count c-1 also alleged that Father and G.M. instructed the children to refer to Mother by her legal name and say they were scared of her, and that Father failed to secure mental health services for the children.

## D.    *DCFS Continues to Investigate*

### 1.    **Statements from the Family**

In late October 2019, a dependency investigator (DI) spoke with Joseph, who stated that Mother was "mean," that he was scared of her, and that she was "disgusting." When asked why Mother was disgusting, Joseph responded it was because she "'eats trash.'" When asked whether he saw her eat trash, Joseph responded that he did not know. When asked what "disgusting" meant, Joseph responded that he did not know. When asked what she did when he did something she did not like, he stated she slapped him, but demonstrated by hitting his own stomach with an open hand. However, when asked why Mother hit him, how many times she hit him, and whether she hit him anywhere else, his response was, "'I don't know'" to each question. He contended that Mother also struck Jennifer. However, he also told the DI that Father and G.M. had instructed him to

10

call Mother "Juana" and to say she was mean and disgusting because she ate trash. When asked how it made him feel when Father and G.M. told him to say these things, Joseph responded, "'I feel sad but I don't cry. Juana said my dad is "stupid."'" Jennifer refused to speak with the DI, and would run away screaming when she approached or spoke with her.

Father stated that one day Jennifer hit G.M. in the buttocks with a sandal, and stated it was what Mother had done to her. He also relayed that Jennifer had said both Mother and Mother's adult daughter hit her and told her she was not nice. He recognized that Jennifer "has excessive tantrums and can isolate [her]self at school" and Joseph "has anger fits, excessive tantrums, [and] hurts [him]self when upset." Father reported that after he and Mother split up, the children were confused: if they were with Father, they did not want to go with Mother, but if they were with Mother, they did not want to go with Father. Additionally, "Jennifer pulled her hair out when we brushed her hair and [had] severe tantrums." He recognized "'[t]he kids are extremely emotional and Jennifer bites herself.'"

Mother claimed the children were being coached, and denied hitting them or sexually abusing Jennifer. Mother's adult daughter stated she had never seen Mother hit Jennifer, and that Mother was "'not the kind of mom that hits.'" She also denied Mother was coaching the children, or had molested Jennifer; in fact, she stated she had heard Jennifer say, "[G.M.] put her finger in me," and stated she had seen Jennifer was "red down there." Mother's sister also

stated she had never seen Mother hit the children, but that Father was "very controlling." She opined that "[e]verything got bad after she (mother) filed for child support." She reported that during Mother's monitored visits with the children, Father would park his car in a visible location and sometimes hold his cell phone up as if he were recording them. After DCFS asked Father to park elsewhere, Mother's sister stated that Joseph began calling Mother "mom" instead of "Juana" and appeared more relaxed, asking for a snack that he had declined when Father's car was visible.

The mother of Father's other son stated that Father was "controlling" and that she left him "because he was mentally and emotionally abusive . . . ." During her custody battle with Father, he "would accuse me of doing things to my son when in fact he was the one doing them. . . . Twice, he has made false allegation[s] of abuse against me. . . . He uses the kids as puppets to make himself look better."

## 2. The Children's Therapy

The children had been receiving therapy since July 2017. A November 2017 progress report from Pacific Clinics stated that Joseph presented with "depressive symptoms at intake (isolation, numbness, defiance)." A progress report from the same day stated that Jennifer presented with "aggressive behavior (hitting, biting)." A March 2018 progress report stated Joseph was working on "reducing defiant, isolative behavior, and crying from 7x / week to 3x /

week" and Jennifer was working on reducing her "aggressive behaviors (hitting, defiance) from 3x / day to 0x / day."

On August 8, 2019, the therapist mailed two letters to Father, stating Joseph's and Jennifer's therapy was being terminated because Father had not responded to an attempt at contact made on July 29, 2019. On September 3, 2019, Joseph had an assessment appointment at Tri-City Mental Health Services, but he arrived and left without receiving an assessment. Father explained that Mother had taken Joseph to Tri-City without notifying Father, which upset Father. When Father arrived at Tri-City, he was told Mother had gotten angry and left with Joseph before Father arrived. He also stated that Mother enrolled Joseph with his previous therapist without Father's knowledge and Father felt that therapist was biased against him.

On October 28, 2019, the children began receiving therapeutic services through court-ordered wraparound services.

### 3. The Children's Education

In November 2019, Joseph's teacher reported concerns that Joseph was regressing academically after being detained from Mother. Joseph was not completing homework, arrived late to school, and had excessive absences. Father reported that Joseph refused to do his homework, and Father "gives up when attempting to complete homework with Joseph."

Jennifer's teacher also reported Jennifer had more absences after being detained from Mother, and that she was concerned regarding Jennifer's behavior. Jennifer would cry when G.M. would drop her off at school, and she would isolate herself from the rest of the class, playing with other children only if they approached her and invited her to play. Additionally, the teacher stated Jennifer was defiant, not following directions, and not learning. Jennifer's teacher commented that prior to the children's detention, both parents would disparage the other to her.

DCFS's jurisdiction/disposition report opined that "the children have learn[ed] to adapt to the parents['] dysfunctional co-parenting strategies by reporting negative things about the mother when they are in the care of the father and saying negative things about the father and his girlfriend when they are in the care of the mother." DCFS concluded that it was "highly likely that both [Mother] and [Father] have at different times, coached the children to speak negatively about the other one . . . ."

### E. *The Children Are Removed from Father*

In December 2019, DCFS filed an ex parte application to remove the children from Father, on the grounds that he was failing to meet Joseph's educational needs and was emotionally abusing the children. Both children's counsel joined DCFS's request, and the court granted the application, placed the children in shelter care, and granted Father visitation, but ordered that G.M. have no contact

14

with the children. Despite the court's order, Father brought the children to DCFS's office while accompanied by G.M.; DCFS informed Father that the children were to have no contact with G.M.[3] Nevertheless, after the children were placed in foster care, Father had the children speak with G.M. via telephone and once during a visit at a DCFS office, when the monitoring CSW took a break, Father attempted to have the children communicate with G.M. through FaceTime.[4]

### F.    *Adjudication and Disposition*

In late December 2019, the court held a combined adjudication and disposition hearing. Preliminarily, the court indicated that DCFS had agreed to withdraw all but counts b-1 and c-1 from the first amended petition. The court also admitted several pieces of evidence, including a letter from Hillsides Family Resources Center, stating that wraparound services for the children had begun on October 28, 2019, and that Father had been "very cooperative with the services and flexible with his time."

---

[3]    At the jurisdictional hearing, Father testified that G.M. had been picking the children up from school when the court made its order, and then G.M. went to the courthouse to pick Father up. Because the family had only one car, all four of them went to DCFS's office to transfer the children to DCFS.

[4]    At the jurisdictional hearing, Father testified that he was not trying to have the children speak with G.M. through FaceTime, but was instead showing Joseph pictures of Father's other son, whom Joseph said he missed.

Two witnesses testified:  Kelsey Glass, the children's therapist from wraparound services, and Father.  Glass testified that she began seeing the children on October 28, 2019, and had been in Father's home three or four times, for approximately one hour per visit.  Father was cooperative and communicative, and the children were comfortable with Father and G.M.  Glass observed positive interactions between the children and Father and G.M. and never saw them instruct the children to say negative things about Mother.

Father explained that the children were often late to school because he lived in Baldwin Park, and they attended school in Pomona.  Father had wanted to place the children in a school closer to his home, but DCFS told him not to.  Regarding mental health services for the children, Father stated they had previously received such services from Pacific Clinics until mid to late August.  Father explained the services from Pacific Clinics ended because he was not allowed to participate, and the people at the clinic would neither see him nor return his phone calls.  Joseph was then assessed by Tri-City but never received services from them because DCFS told Father that wraparound would take over.  Father denied ever telling the children to call Mother by her given name, or coaching them to disparage or express fear of her.  Regarding being present when Mother was visiting with the children, Father stated he did not realize it was improper, and that he did so because he lived far from the visitation site and had decided to wait for the visit to end

16

rather than drive home.  Once DCFS asked him to leave, however, he complied.

The court then heard argument.  Counsel for the minor Joseph asked the court to sustain counts b-1 and c-1, with the amended language DCFS had proposed.  Joseph's counsel argued there was evidence that both parents were falsely accusing the other of abuse, causing the children to undergo multiple interviews and examinations, and there was no evidence the parents understood their behavior was inappropriate, or that they were willing to work to remediate it.  Regarding disposition, Joseph's counsel requested that the children be removed from both parents and "suitably placed."  Counsel for the minor Jennifer joined in the arguments made by Joseph's counsel.

Father's counsel argued the court "should take jurisdiction in this matter" under Section 300(b), arguing that the children were being damaged by Mother's behavior and false accusations.[5]  However, Father's counsel asked the court to strike the allegation that Father failed to secure mental health services for the children as unsupported by evidence, and to change the allegation that "parents have spoken negatively" to "Mother has spoken negatively with respect to Father."  Father's counsel argued the court lacked

_____

[5]      While it was initially unclear that Father's counsel wanted the court to take jurisdiction only under Section 300(b) (and based solely on Mother's conduct), when the court later asked her to argue regarding disposition, she responded, "I'm sorry, your honor.  I haven't addressed [count] c yet."

17

jurisdiction under Section 300(c) because the children's emotional issues did not "rise to the level of [Section 300](c) with respect to serious emotional damage." If the court ruled otherwise, Father's counsel requested that it find Mother, not Father, to be the cause of the emotional damage. Finally, Father's counsel argued that should the court take jurisdiction, the children should be released to Father.

Mother's counsel argued that Father's testimony was not credible and that it was obvious the children were being coached. Counsel "submitt[ed]" on both the b-1 and c-1 counts, offering no argument, and stated Mother was coming to the court "with her hat in her hand," and was enrolled in all services recommended by the court. Mother's counsel requested the court release the children to Mother or, alternatively, permit the children to move into Mother's home along with their maternal grandparents, while Mother moved out.

Counsel for DCFS joined in the arguments made by the children's counsel that jurisdiction should be sustained as to both counts, and that the children should be removed from both parents.

The court sustained the amended b-1 count, finding "ample evidence . . . that both parents have subjected the children to such a toxic environment that indeed they place the children at substantial risk of serious physical harm." The court believed the children's statements that Father instructed Joseph to disparage Mother and told Jennifer to call G.M. "mother" over Father's contrary testimony, which

18

the court did not find credible. The court found that the children had been "mercilessly coached" by both parents. The court likewise sustained the amended c-1 count, pointing not only to the evidence supporting the b-1 count, but to the evidence that the children "exhibited physical manifestations of the emotional abuse" and were "exhibiting extreme behavior and mental health issues."

As sustained, the amended b-1 count provided that Mother "placed the children in a detrimental and endangering situation in that, the mother and the father, Joey C[.], have engaged in an ongoing custody dispute, which includes the mother making continuing accusations that the father is abusing and neglecting the children. The mother subjected the children to numerous unnecessary interviews with social workers, law enforcement officers, and doctors, as a result of the mother's allegations of abuse [of] the children by the father and the father's female companion, G[.] M[]. On 9/24/19, the mother subjected the child, Jennifer to a medical exam for possible sexual abuse and medical neglect. On 9/24/19, the mother subjected the child Joseph to a medical exam for possible medical neglect. Additionally the mother has taken the children to the doctor approximately sixty times after the children visit[ed] with the father for possible abuse and neglect of the children by the father. The parents have spoken negatively about each other in the presence of the children. Further, the mother has been admonished by the Court to refrain from making allegations against the father to DCFS. Moreover, the father, and the

19

father's female companion, G[.] M[.] have instructed the children to refer to the mother by her legal name, Juana[,] and to say that they are scared of the mother because the mother is mean to them.  Further, the father failed to secure mental health services for the children.  The detrimental and endangering situation created for the children by the father and the mother, places the children at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior towards self and others."

The amended c-1 count provided that Mother and Father had "abused the children.  Such emotional abuse consisted of the mother and father engaging in an ongoing custody dispute, which includes the mother making ongoing accusations that the father is abusing and neglecting the children.  The mother subjected the children to numerous unnecessary interviews with social workers, law enforcement officers, and doctors, as a result of the mother's allegations of abuse to the children by the father and the father's female companion, G[.] M[].  Moreover, the father, and the father's female companion, G[.] M[.] have instructed the children to refer to the mother by her legal name, Juana[,] and to say that they are scared of the mother because the mother is mean to them.  Such emotional abuse of the children by the parents resulted in the children demonstrating anger issues, aggressive behaviors, isolating behavior, defiant behaviors, and poor impulse control.  Further, the father failed to secure mental health services

20

for the children.  Such emotional abuse on the part of the mother and father places the children at substantial risk of suffering serious emotional damage as evidence[d] by aggressive behaviors towards self and others."

Because the court found by clear and convincing evidence that no safety measures could protect the children, it removed them from both parents and ordered a custody evaluation under Evidence Code section 730.  Father timely appealed.

## DISCUSSION

### A.    *Forfeiture*

DCFS argues that Father may not challenge whether count b-1 sufficiently alleges jurisdiction under Section 300(b)(1).  It also argues that Father is foreclosed from challenging jurisdiction on either count to the extent such challenge is based on the sufficiency of the evidence of Mother's conduct to warrant jurisdiction.  Finally, it contends Father has forfeited any challenge to the court's taking jurisdiction under Section 300(c) based on an argument that there was no danger to the children.  We agree that Father has forfeited any challenge to the sufficiency of the petition to allege jurisdiction under Section 300(b)(1) as well as any challenge to the court's taking jurisdiction under Section 300(b)(1) based on Mother's conduct.  We disagree that Father is barred from challenging the court's taking jurisdiction under Section 300(c).

21

### 1. Father May Not Challenge the Sufficiency of the Allegations Under Count B-1

Father argues the court erred in finding jurisdiction under Section 300(b)(1) because the allegations in count b-1 "failed to even remotely allege how the custody battle or lack of mental health services caused 'serious physical harm or illness' to the children, as statutor[il]y required to declare the children under subdivision (b)." DCFS responds that Father has forfeited this argument because he did not challenge the sufficiency of the petition below. Father does not dispute that he failed to raise this argument below and thus we agree that he has forfeited it on appeal. (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 82 [father forfeited claim that amended petition did not state cause of action by failing to object in juvenile court]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1640 ["Allowing parties to challenge the facial sufficiency of a petition for the first time on appeal conflicts with the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail. [Citation.] Enforcing the forfeiture rule requires parties to raise such issues in the juvenile court where they can be promptly remedied without undue prejudice to the interests of any of the parties involved"].) Here, the defect Father alleges could easily have been raised and addressed below.

We also note that while Father is correct that count b-1 lacks an allegation the children suffered physical harm, the court expressly found "ample evidence in this matter that, leading up to the department's involvement in this case with this petition, that both parents have subjected the children to such a toxic environment that indeed they place the children at substantial risk of serious physical harm." Father has not challenged this finding.[6]

---

[6] Father does argue that "the allegation that father didn't provide the children with mental health services was not even remotely true as father did participate in in-home Family Wraparound Services and was highly cooperative with allowing mental health providers into his home," and therefore any finding that he failed to provide mental health services cannot be affirmed due to lack of substantial evidence. To the extent this constitutes a substantial evidence challenge to the court's finding, we reject it. The therapist from wraparound services testified she did not begin providing services until October 28, 2019, and Father testified he was unsure when the children's therapy had ended, but he thought it was "mid to late August." In fact, Father received two letters on August 8, 2019, stating Joseph's and Jennifer's therapy had been terminated because Father had not responded to an earlier attempt to contact him. Additionally, while Joseph had an assessment at Tri-City Mental Health Services in early September, that assessment apparently did not occur because Father was angry that Mother had taken Joseph to Tri-City without notifying him. Substantial evidence supports a finding that there was an almost 3-month period during which the children were deprived of mental health services due to Father's actions.

23

### 2. Father Has Not Forfeited His Challenge to Jurisdiction Under Section 300(c)

Father also argues that the court erred in taking jurisdiction under Section 300(c), and DCFS again counters that Father has forfeited this challenge to the extent it is based on Mother's conduct or an argument that there was no evidence that the children's well-being was endangered. We disagree.

While Father's counsel did ask the court to take jurisdiction based on Mother's conduct, counsel was referring only to the b-1 count. Though this was unclear when counsel first made her remarks asking the court to take jurisdiction, when the court later asked her to speak as to disposition, she responded, "I'm sorry, your honor. I haven't addressed [count] c yet," indicating that all her previous comments had been directed toward count b-1. And, when counsel did address the c-1 count, she argued Section 300(c) was inapplicable because the evidence did not "rise to the level" needed to take jurisdiction under that subsection.[7] Therefore, Father has not forfeited any challenges to the court's taking jurisdiction under Section 300(c).

---

[7] DCFS recognizes this in its brief: "Regarding count c-1, father's attorney argued the allegation was insufficient to allow for jurisdiction under section 300, subdivision (c)."

24

**B.** *Jurisdiction Under Section 300(c)*

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)

Section 300(c) permits a court to take jurisdiction over a child if it finds "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." (Welf. & Inst. Code, § 300, subd. (c).)

Here, the petition alleged that the parents' ongoing custody dispute, including Mother's continued accusations regarding Father and Father's instructing the children to call Mother by her first name and tell DCFS they were scared of her, "resulted in the children demonstrating anger issues, aggressive behaviors, isolating behavior, defiant behaviors, and poor impulse control. Further, the father failed to secure mental health services for the children. Such emotional abuse on the part of the mother and father

25

places the children at substantial risk of suffering serious emotional damage as evidence[d] by aggressive behaviors towards self and others." In sustaining the count, the court found that both parents subjected the children to a "toxic environment," that the children had been "mercilessly coached" by their parents, that they had "exhibited physical manifestations of the emotional abuse," and that they were "exhibiting extreme behavior and mental health issues . . . ."

Father argues the court erred in taking jurisdiction under Section 300(c) because the c-1 count alleged only "'emotional abuse,'" not "'serious emotional damage,'" and there is no evidence of "'severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others.'" We disagree.

As to the sufficiency of the language in count c-1, Father is mistaken: the count specifically alleged that the parents' emotional abuse "places the children at substantial risk of suffering serious emotional damage . . . ."

As for Father's contention that substantial evidence does not support the court's finding, we disagree. A November 2017 progress report from Pacific Clinics stated that Joseph presented with "depressive symptoms at intake (isolation, numbness, defiance) . . . ." A progress report from the same day stated that Jennifer presented with "aggressive behavior (hitting, biting)." A March 2018 progress report stated Joseph was working on "reducing defiant, isolative behavior, and crying from 7x / week to 3x /

week" and Jennifer was working on reducing her "aggressive behaviors (hitting, defiance) from 3x / day to 0x / day."

Other evidence shows that in several instances, the children manifested severe anxiety when being interviewed about the allegations made by the parents. On July 30, 2019, Mother brought Joseph to his pediatrician to be examined because G.M. had allegedly "smacked him in the head," but at the doctor's office, he "refus[ed] to be examined, screamed at the pediatrician and . . . shut down and did not talk." On August 21, 2019, Mother brought Joseph to the Baldwin Park Police Department to report that Father had forced Joseph to drink Father's urine. At the police station, Joseph refused to speak with the officer alone, and hid under Mother's chair. He refused to answer questions about the alleged urination incident or any questions about Father. Father himself reported that Joseph "has anger fits, excessive tantrums, [and] hurts [him]self when upset."

Similarly, Jennifer refused to speak with a DI, and ran away screaming whenever the DI approached her. Father also reported that Jennifer "has excessive tantrums and can isolate [her]self at school." He told a DI that after he separated from Mother, "Jennifer pulled her hair out when we brushed her hair and [had] severe tantrums." He recognized "'[t]he kids are extremely emotional and Jennifer bites herself.'" Moreover, it was reasonable for the court to conclude that the children's suffering stemmed from the "toxic environment" that both parents created by coaching their children to disparage and accuse the other parent of

27

abuse. Thus, substantial evidence supports the court's finding that the children suffered from "severe anxiety, depression, withdrawal, or untoward aggressive behavior . . . ." (Welf. & Inst. Code, § 300, subd. (c).)[8]

### C. *The Court Did Not Err in Removing the Children*

Father contends the court could not remove the children from his custody "unless the Department proves by clear and convincing evidence that there is 'a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor[s] if the minor[s] were returned home,' and that even with the provision of services, there is no other reasonable way to protect the child[ren]." Here, the court made such a finding: "there is clear and convincing evidence of substantial risk of detriment if the children are left in the care and custody of either parent today," and "there are no safety measures that can be put in place."

---

[8] *In re Brison C.* (2000) 81 Cal.App.4th 1373, on which Father relies, is inapposite. *Brison C.* stands for the proposition that a child's fear and dislike of a parent alone is insufficient to support a finding of emotional disturbance sufficient to take jurisdiction under Section 300(c). (*Brison C., supra,* at 1380.) Here, there is much more than the children's expressed dislike for whichever parent they were not currently with; as discussed, both children were acting out in ways indicating they were being "mercilessly coached" by both parents, to their demonstrable detriment.

Father urges us to reverse the removal order because the parental conflict and any failure to secure mental health services for the children did not cause serious physical or emotional damage to the children, and there was insufficient evidence that there was a substantial danger to the children if they were released to Father.  Again, we disagree.

The court found that both parents spoke negatively about the other, were "mercilessly coach[ing]" the children to make accusations regarding the other parent, and had subjected the children to a "toxic environment."  As discussed, substantial evidence supports these findings. Father himself admitted the children's behavior became problematic after he and Mother separated, and while they disagreed on fault, both parents agreed they were engaged in a custody battle.  Father has never taken any responsibility for his role in creating the toxic environment, instead denying any wrongdoing.  The harm caused to the children, combined with Father's lack of insight, are substantial evidence supporting the court's finding that the children were at substantial risk of detriment if left in Father's care,

29

and that no safety measures could be put in place to protect them.[9]

---

[9] Father also argues that substantial evidence does not support the court's finding that he told the children to call Mother by her given name, or that he failed to procure mental health services for the children. As to the first point, the children explicitly stated that Father had told them to call Mother by her given name. As to the second, the evidence shows that the children's therapy was terminated in early August due to Father's failure to communicate with the therapist's office, but therapy through wraparound services did not begin until the end of October. In any case, these were hardly the only reasons that the court removed the children from Father.

Similarly, Father argues that the children's lateness to school or his intrusion on their visits with Mother were insufficient reasons to remove them from his custody. Again, these incidents were not the only reasons for removal, but instead were part of a pattern of behavior undermining the children's relationship with Mother as part of the ongoing custody battle, which contributed to the emotional damage inflicted on the children.

## DISPOSITION

The court's jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

31